**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**DeWayne A. STRICKLAND,**
**Defendant–Appellant.**

**No. 96–6665.**

United States Court of Appeals,
Sixth Circuit.

Argued March 19, 1998.

Decided May 20, 1998.

Paul W. Laymon, Jr., Asst. U.S. Atty. (argued and briefed), Office of the U.S. Attorney, Chattanooga, TN, for Plaintiff–Appellee.

Leonard M. Caputo (argued and briefed), Phillips & Caputo, Chattanooga, TN, for Defendant–Appellant.

Before: BOGGS, NORRIS, and MOORE, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

This case requires us to decide whether the Fourth Amendment's requirement of probable cause for an arrest is satisfied when, in effecting an arrest of a suspected drug dealer, police officers rely solely on the statements of an informant as to the manner in which the planned drug deal would take place and on certain occurrences the officers

observe at the time and place of the planned drug deal that appear to corroborate the informant's statements. We hold that the probable cause requirement was satisfied in this situation.

## I

Defendant DeWayne Strickland was arrested on January 23, 1996, for selling an ounce of cocaine to Henry Haggard, an indicted drug offender who was working as a police informant. The transaction was arranged by Haggard at the behest of police detectives in Chattanooga, Tennessee. With detectives present, on January 23, 1996, Haggard made two taped telephone calls to his brother-in-law in which Haggard asked his brother-in-law to help him obtain cocaine. In response, Haggard's brother-in-law suggested that Haggard contact Strickland, and gave Haggard Strickland's telephone number. Haggard then telephoned Strickland, again in the presence of the detectives; however, for reasons not fully explained in the record, this conversation was not taped. During this telephone call, the detectives heard Haggard confirm a meeting with Strickland to take place at 7:30 p.m. that evening at a Chattanooga convenience store called the Corner Market. After concluding his telephone call with Strickland, Haggard informed the detectives that he had arranged to purchase one ounce of cocaine from Strickland for $1000.[1] Haggard further explained that the course of dealing he and Strickland had followed in the past involved meeting inside an automobile, chatting for a few moments, and then exchanging money for drugs. Detective Greg Bowman then gave Haggard $1000 in marked bills, which Haggard was to give Strickland in exchange for the cocaine.

Detective Bowman enlisted the assistance of several other police officers to stake out the area around the Corner Market. Detective Bowman arranged for Haggard to wear a "wire" to the transaction, with Chattanooga police detectives Dunn and Hill assigned to monitor the audio transmissions. Detectives Batts and Turner were assigned to visual surveillance duty and stationed themselves 75 to 100 yards from the Corner Market. At about 7:30 p.m., Detective Turner saw Haggard drive up to the Corner Market. A few minutes later, a sport-utility vehicle pulled into the parking lot. Three men got out of the vehicle; two of them walked into the Corner Market, while the third—Strickland—walked over to Haggard's car. Strickland climbed into Haggard's car, and Detective Batts (who was viewing the encounter through binoculars) observed the two men talking. After a few minutes, Strickland got out of Haggard's car and began walking back toward his own vehicle. Detectives Turner and Batts had been waiting to receive word that the transaction had been consummated from Detective Dunn, who was monitoring the audio transmissions from Haggard's "wire." Since Strickland was on the verge of leaving the scene, however, Detective Batts gave the signal to move in, and as a result all the detectives on the stakeout converged with guns drawn on the Corner Market parking lot. After the detectives secured Strickland (but before they searched him), Strickland said to the officers—with no apparent prompting—"So what are y'all doing? You can't put me in jail. You ain't seen me with no dope. I ain't got no dope."

Detective Turner approached Haggard, who got out of his car with his hands up and with what appeared to be a bag of cocaine in his hand. After apprehending Strickland's companions, who by this time were standing outside in the parking lot, the officers searched Strickland. In Strickland's pockets, they discovered the $1000 in marked bills given to Haggard by Detective Bowman, as well as $950 in unmarked currency. They also discovered money and drugs in the possession of Strickland's companions.

## II

In February 1996, Strickland and two co-defendants were indicted in the United

---

**1.** Technically, Haggard's agreement with Strickland was that Haggard would pay Strickland $1000, representing a debt owed from a prior transaction that also involved an ounce of cocaine, and that Strickland would then give him another ounce of cocaine. In his brief, however, Strickland characterizes the arrangement as a purchase of an ounce of cocaine for $1000, and we adopt his functional characterization.

States District Court for the Eastern District of Tennessee on two counts of possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. Strickland moved to suppress, for lack of probable cause, the evidence obtained by the detectives in the course of their search of Strickland and his companions on January 23, 1996. After rejecting the government's argument that the detectives merely stopped and frisked Strickland on reasonable suspicion as permitted under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a magistrate judge concluded nonetheless that the police had probable cause to arrest and search Strickland. The magistrate judge relied on the two taped telephone calls between Haggard and his brother-in-law in which Haggard's brother-in-law mentioned Strickland as a source of cocaine; one telephone call between Strickland and Haggard, one side of which was heard by Detective Bowman; Haggard's description of the time, location, and manner of the scheduled drug transaction; and Strickland's arrival at the appointed place and time. Strickland filed objections to the magistrate judge's report and recommendation, asserting that these grounds were insufficient to satisfy the requirements of the Fourth Amendment, but the district court adopted the magistrate judge's report.

Strickland then entered into a plea agreement with the government in which he agreed to cooperate with the prosecution in connection with the trials of his co-defendants. Accordingly, at Strickland's sentencing hearing, the government moved for a downward departure from the guideline sentencing range pursuant to USSG § 5K1.1. The district court denied this motion, observing that Strickland's assistance did not result in the convictions of his codefendants and stating that "the Court is not completely convinced that your assistance to the government was substantial. But the Court is going to give you the benefit of the doubt and give you a sentence at the extreme low end of the guideline range." The district court then sentenced Strickland to a term of 294 months in prison. This timely appeal followed.

## III

### A

 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. CONST. amend. IV. An "arrest without a warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir.1988). The principal question for us today is whether the detectives had probable cause to arrest and search Strickland. Strickland argues that there was no probable cause because, at the time they arrested and searched him, the detectives could not be certain that Strickland actually had sold cocaine to Haggard; in the words used in Strickland's brief, the detectives "did not know what had happened in the car" and "did not know whether any illegal activity had occurred."

 To explain why Strickland's argument is wrong, we start with a few general principles. The most important of these is that the Fourth Amendment does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect. *See United States v. Barrett*, 890 F.2d 855, 861 (6th Cir.1989). The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the "factual and practical considerations of everyday life" that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. *See Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however,

while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt. *See, e.g., United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990).

The real question, then, is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause? In many respects, this raises a difficult epistemological problem. As Descartes famously observed, to the skeptic, any proposition—no matter how seemingly certain—carries with it a degree of doubt.[2] But judges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct.[3] Instead, we need only consider whether there are facts that, given the "factual and practical considerations of everyday life," could lead a reasonable person to believe that an illegal act has occurred or is about to occur. *See Gates,* 462 U.S. at 231, 103 S.Ct. 2317. As evidence pointing to a suspect's likely illegal behavior mounts, it will approach a threshold beyond which probable cause exists. While it is difficult to define that threshold with linguistic precision, the traditional legal tool of analogical reasoning generally permits us to determine whether a given set of facts, when compared with prior cases, is sufficient to satisfy the probable cause requirement.[4] Looking to the precedents of the Supreme Court and of this court, we conclude that the probable cause requirement was satisfied in this case.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), a local Illinois police department received an anonymous letter stating that Lance and Susan Gates were drug dealers. The letter detailed the Gateses' usual *modus operandi* in which Susan Gates would drive to Florida, drop off the car to be loaded with drugs, and immediately fly back to Illinois; Lance would fly to Florida, pick up the loaded car, and drive the drugs back to Illinois. *See id.* at 225, 103 S.Ct. 2317. Following up on the tip, the local police department confirmed a local address for Lance Gates and learned that Lance Gates had purchased an airline ticket to Florida. Undercover officers then followed him onto the airplane, observed him check into a motel room registered to "Susan Gates," and saw Gates and an unidentified woman leave town on a northbound interstate highway the very next day in a vehicle bearing Illinois license plates. *See ibid.* Police officers submitted an affidavit setting forth these facts to a local judge, who signed a search warrant. The officers searched the Gateses' home, where they found a substantial quantity of drugs. *See ibid.* The Gateses challenged the search warrant, contending that it was not supported by probable cause. Rejecting the Gateses' argument that the anonymous letter was an invalid basis for finding probable cause because its underlying source of knowledge was not identified, the Supreme Court held that under a "common-sense, practical" approach to probable cause, the search warrant was valid. *See id.* at 230, 103 S.Ct. 2317.

In *United States v. Barrett,* 890 F.2d 855 (6th Cir.1989), a state drug-enforcement agent arranged for an informant to purchase

---

**2.** *See* 2 Rene Descartes, Meditations on First Philosophy, in The Philosophical Writings of Descartes 16 (John Cottingham et al. trans., 1984) (1642).

**3.** Indeed, that is not required even for a conviction. *See, e.g., United States v. Johnson,* 741 F.2d 854, 856 (6th Cir.) (to support a conviction, "evidence ... need not exclude every logical hypothesis other than guilt, but need only be sufficient for a reasonable trier of fact to find that the evidence established guilt beyond a reasonable doubt."), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984).

**4.** We therefore were quite puzzled when, at oral argument, neither defense counsel nor the Assistant United States Attorney was able to cite so much as a single factually analogous case to help us address the issues presented here. While no one could doubt counsel's statement that each case turns on its particular facts, the usual job of the lawyer is to make arguments as to why the case at bar is more like one case than another based on inferred principles that appear to justify judgments in particular cases. *See* Edward H. Levi, An Introduction to Legal Reasoning 1–2 (1947).

an ounce of cocaine from Jeffrey Dolan, a suspected drug dealer. On May 26, 1988, the informant (who had purchased cocaine from Dolan once before) did so, and then (at the behest of the agent) arranged to purchase another ounce later in the day. After the initial purchase, the informant told the agent that Dolan had said he would have the second ounce of cocaine available later that day. The agent then submitted an affidavit to a judge, in which the agent included the information provided by the informant. *See id.* at 857. The judge then issued a search warrant. Agents searched Dolan's trailer but were unable to locate the ounce of cocaine the informant had said would be there. With agents still in the trailer, defendant Virgile Barrett came to the Dolan residence. After questioning Barrett during a brief *Terry* stop, the agents arrested him on drug charges. A search of Barrett's automobile revealed an ounce of cocaine in a small pouch—apparently, the ounce of cocaine that Dolan was supposed to sell to the informant. *See ibid.* Barrett challenged the agent's search, arguing that it was not supported by probable cause. We rejected this argument, holding that the probable cause requirement was satisfied by circumstances including the fact that a reliable informant had purchased drugs from Dolan previously, that the informant had said Dolan would have an additional ounce of cocaine at his trailer on the day of the events at issue, that Barrett arrived at Dolan's residence at about the time the informant was scheduled to purchase the cocaine from Dolan, and that Barrett appeared nervous when questioned by the agents. *See id.* at 861–62.

This case is analogous, in various respects, both to *Gates* and to *Barrett.* Like *Gates,* this case involves a detailed tip from an informant, whose details were substantially corroborated by subsequent police observation. As in *Gates,* the police here did not witness any actual illegality, and thus it is possible to imagine innocent explanations for the similarities between the informant's prediction of events and the events as they actually occurred. It is conceivable, for example, that Strickland merely decided to go for a bucolic evening drive to the Corner Market with two associates, and to duck into Haggard's car to say hello and chat for a while while his associates loitered around the parking lot. Conceivable, we emphasize, but not very likely to an objective observer exercising common sense.

Like *Barrett,* this case involves a tip from an informant whose previous drug-related activities were known to the police. Here, Haggard told police officers the details of a planned drug sale, based on a conversation with the suspect to which the officers were not privy; this same fact is present in *Barrett.* And again, while the officers in this case did not actually witness any illegality, the officers relied on other information that corroborated statements of the informant— just as in *Barrett.* If anything, this case presents stronger evidence of probable cause than that presented in *Barrett,* because here the person arrested was the very person identified as a drug dealer by the police informant.

We believe that the lesson of *Gates* and *Barrett*(and the many similar cases that can be collected, *cf.* WAYNE R. LaFAVE, SEARCH AND SEIZURE §§ 3.2–3.3 (2d ed.1987 & 1995 supp.)) is that the corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect. The more unusual the occurrences are that the police are able to confirm, the stronger the showing of probable cause, and vice versa. Of course, there will be marginal cases that will raise difficult issues of factual sufficiency, but this is not such a case. Armed with two taped conversations of known drug dealers who identified Strickland as a potential source of cocaine, an informant's account of a conversation in which Strickland agreed to meet Haggard at a certain time and place to sell him cocaine, and the independent observation of Strickland's arrival at the Corner Market with associates who did not accompany Strickland into Haggard's car, the police decided to arrest Strickland. We hold that, on these facts, the officers had probable cause to do so.

**B**

In addition to disputing the existence of probable cause, Strickland chal-

**418**

lenges the district court's decision not to depart downward from the guideline sentencing range applicable to his offense. A district court's decision not to depart downward from the Sentencing Guidelines ordinarily is not appealable. *See United States v. Byrd,* 53 F.3d 144, 145 (6th Cir.1995). The only circumstance in which such a decision is reviewable on appeal is where the district court erroneously believed a downward departure was legally precluded or was outside its discretionary power. *See United States v. Ebolum,* 72 F.3d 35, 37 (6th Cir.1995). Where the district court's sentencing decision evinces a purposeful decision not to depart downward, however, it is not appealable. *See Byrd,* 53 F.3d at 145. Moreover, the district court need not explicitly state that it is aware of its discretionary power to depart downward; as long as the record makes clear such an awareness, the district court's decision is insulated from review. *See ibid.*

█ Here, the record clearly demonstrates that the district court carefully considered the government's motion for a downward departure, and rejected the motion not because of a perceived lack of authority but because of a considered judgment that Strickland's cooperation with prosecutors was not sufficient to warrant a downward departure. We decline to second-guess the district court's judgment in this regard.

### IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.