**UNITED STATES of America, Plaintiff,**

v.

**Andre HURSTON, Defendant.**

**No. Crim. 97–81183–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

June 29, 1998.

---

Kelvin Scott, Detroit, MI, for Plaintiff.

William Ford, Detroit, MI, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

BORMAN, District Judge.

*Introduction*

This case involves a 5 a.m. warrantless at-home arrest of Defendant Andre Hurston for questioning by 11 police officers, seven of whom were part of a law enforcement task force. A Detroit Police Department Homicide Lieutenant had ordered the task force to arrest 7–8 individuals for questioning about gang-related homicides.

The Government's Brief in Response to Defendants' Motion to Suppress states:

> Lastly, the officers and agents were acting under orders from a DPD homicide Lieutenant who wanted defendant arrested for questioning. While *this practice is frowned upon*, it does not rise to the level

of "flagrant police misconduct." *DPD homicide officers often "arrest" individuals for questioning purposes. The government in this case neither condones nor defends that practice,* however, it should not be labeled "flagrant misconduct."

Government Brief, Feb. 9, 1998, P.6. (emphasis added). In essence, the Government concedes that arresting Defendant Hurston for questioning was improper, but argues that the unlawful arrest was not flagrantly unlawful. This Court need not determine whether or not the instant arrest was flagrant misconduct. This arrest for questioning was not based upon probable cause, and, was therefore, in violation of the Fourth Amendment. In addition, the Court finds that this unlawful arrest tainted the subsequent statements/consent of the defendant, and further, that the subsequent "consent" to search by his girlfriend Ms. Gwen Vincent, after the officers had fanned out throughout the house, was neither voluntary nor timely. Thus, the Court grants Defendant's Motion to Suppress the evidence seized during the search and his statement made after his arrest.

*Background*

On October 2, 1997, at 5:00 a.m., at the direction of Lt. Reid of the Detroit Police Department Homicide Division, a task force composed of seven federal, state and local law enforcement officers and four backup local officers approached the residence at which Defendant Andre Hurston was located to arrest him for questioning. The residence was also occupied by Ms. Vincent and her two young children, ages five and two. The officers knocked on the door and when Mr. Hurston opened the door, they stepped in with their guns drawn and arrested him. Thereafter, the officers entered further into the house and observed a single firearm in plain view on the kitchen table.

Thereafter Defendant stated that there were additional firearms in the bedroom, and allegedly consented to a house search. It is not clear whether Defendant Hurston was in handcuffs when he was asked whether there were weapons in the house. Compare testimony of S.A. Mueller at Motion to Suppress Hearing, January 26, 1998, TR. Pp. 103 and

107. A further search of the premises, re-vealed additional firearms in the bedroom closet.

After the officers had entered, arrested Hurston, discovered the firearm in the kitchen, and fanned out to search the house, some officers brought Ms. Vincent to a room and asked her for consent to search the house. She signed a consent to search form. It is not clear whether she signed the form before or after the additional firearms had been discovered. Edwards, TR. P. 61. Ms. Vincent testified that she signed the consent because one of the police said "sign this so we don't tear up your home." Vincent, TR. 23, 34. The agents testified that she signed it after reading it aloud. Edwards, TR. 78. Ms. Vincent denied this. Vincent, TR. P.25. She testified that she felt "scared" when she signed the form. Vincent, TR. 23.

Defendant Hurston was subsequently indicted under 18 U.S.C. § 922(g)(1) for the offense of felon in possession of firearms, (seven firearms). Defendant filed a Motion to Suppress his statement and the firearms; the Government filed a response; the Court held an evidentiary hearing, and subsequently requested that the parties file supplemental legal memoranda relating to the Fourth Amendment issues.

Having reviewed original briefs, the memoranda and the transcript of the hearing, the Court grants Defendant's Motion to Suppress. The Court finds that the initial arrest of Defendant Hurston was in violation of the Fourth Amendment to the Constitution, and that the subsequent searches/statements were the fruit of the poisonous tree (initial arrest) under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Court further finds that the alleged consent to search signed by Ms. Vincent was neither voluntary nor timely, because the evidence does not establish that the consent form had been signed before the firearms were discovered in the bedroom closet. Thus, even if her consent were deemed to have been voluntary—which the Court does not so find—that consent could not have provided an independent basis for upholding the search and seizure, since an

after-acquired consent cannot legalize a prior non-consensual illegal search.

*Preliminary Legal Discussion:*

A recent decision of the U.S. Court of Appeals for the Sixth Circuit, *United States v. Strickland,* 144 F.3d 412 (6th Cir.1998) May 20, 1998, sets forth the backdrop for an analysis of a Fourth Amendment issue:

> The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. An "arrest without a warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988).

144 F.3d at 413. The Court of Appeals opinion then explicated:

> There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt. See, e.g., *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990).
>
> The real question, then, is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause?

The Court concluded that the manner for determining whether the facts, "given the 'factual and practical considerations of everyday life' could lead a person to believe that an illegal act has occurred" is to compare the case to relevant legal precedent of the Supreme Court and the Sixth Circuit. 144 F.3d at 413. This opinion will explicate the facts of the instant case, and then apply relevant legal precedent.

*Background Facts as to Defendant Andre Hurston:*

In the instant case, the suppression hearing testimony of Officer Gregory Edwards yielded the following pertinent facts:

1. Edwards is a member of a "Red Rum Task Force," composed of federal agents and local police, which investigates drug-related homicides committed by drug organizations. TR. Pp. 40–41.

2. Edwards went to Defendant's house to bring him "in for questioning to the [Detroit Police Department] homicide section." TR. P. 47.[He] was wanted by them for questioning regarding a homicide. TR. P. 48. Defendant was arrested for questioning. "My role ... was to bring him into [sic] the homicide for questioning because they viewed him as a suspect." TR. P. 48.

3. The officers had no arrest warrant or search warrant. TR. P. 47.

4. They surrounded the house with 11 officers, had a police car with oscillating lights flashing, banged on the door and identified themselves as the police. When Defendant opened the front door, they entered with their guns drawn and arrested him in the foyer. TR. Pp. 51–54, 98. The police informed Hurston that he was under arrest. TR. P.83.

5. "Q. [The Court] He came to the door, and you arrested him?

A. Yes." TR. P.98.

6. "After entry was made, one gun, it was a handgun, was located in the kitchen as you entered the front door, and that was brought to everyone's attention, and that sent a red flag." TR. 57.

"Q. Now how long after you entered the house that the gun is identified in the kitchen?"

"A. Maybe a minute or two, if that." TR. 58.

"Q. How soon after you entered was the firearm located in the kitchen?"

"A. Less than a minute, if that." TR. 77.

7. "Q. When the gun was found, was Mr. Hurston already in custody?"

"A. He was detained, yes."

"Q. He was not free to leave?"

"A. No, he wasn't." TR. 59.

8. Detroit Police Homicide Lieutenant Rice sent the task force to arrest Mr. Hurston—to bring him down to homicide. "He didn't send us there to investigate." TR. P. 69.

9. The information I had from Lieutenant Rice was that Hurston was suspect in homicides, "I don't recall how many." TR. P. 70.

10. Edwards had information that

a. Hurston was a member of a gang—the Seven Mile Dogs. TR. P. 73.

b. "that Hurston carried a lot of weapons, in particular he carried one laser sighting during one of the homicides that took place where one victim was killed with a laser sighting." TR. P. 73.

c. the two Wells brothers were the leaders of the Seven Mile Dogs; Defendant had been associated with one of the brothers, Keon, who had been arrested for one of the homicides. TR. Pp. 74–75.

d. Hurston was one of 7 or 8 people the police were seeking to arrest for questioning related to the Seven Mile Dogs gang and the murders. TR. Pp. 96–97.

A second law enforcement agent witness at the suppression hearing was Federal Drug Enforcement Administration Special Agent (DEA) James Mueller, whose testimony yielded the following pertinent facts:

1. He was the officer who "banged on the door and said police very loudly." TR. P. 101.

2. That when Hurston opened the door "I told him that we were the police. I asked if we could come in." Hurston said yes. TR. P. 102.

3. When Mueller got in the door, he "asked Hurston who he was." When Hurston said "Andre Hurston," "he was immediately placed under arrest." TR. P. 102.

4. "I asked him if we could search his house, but that must have been 30 seconds later." TR. P. 102.

5. "I asked if there were weapons in the house, and he said yes. I asked where. He said in the closet of the bedroom. I asked if he had any problem if we searched his residence, and he said no, go ahead." TR. 103.

6. S.A. Mueller gave contradictory testimony as to whether Defendant Hurston was handcuffed when asked to consent to search of the house.

A. No handcuffs and no guns were on him when I asked him the question. TR. P. 103.

. . .

A. After I place [sic] cuffs on him and read his rights, I asked him if weapons were in the house. TR. P. 107.

7. We had "information from Detroit Police Department Homicide and street sources that said he carried two guns at all times with laser sights, and wouldn't be taken alive." TR. Pp. 102–103.

8. Detroit Police Homicide was "looking at him as a suspect in several drugrelated homicides with different gangs." TR. P. 104. They needed to interview him in relation to the homicide in which he was a suspect. TR. P. 105.

*Legal Discussion as to Defendant Andre Hurston*

The issue before the Court is not whether the officer's state of mind in arresting Mr. Hurston provides the legal justification for the arrest, but whether the circumstances, viewed objectively, justified the arrest. See *Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). More specifically, the issue is whether the police had probable cause when they arrested Mr. Hurston at his home at 5 a.m. on October 2, 1997.

 In determining whether the arrest satisfied the probable cause standard, the Court must take into account all of the information possessed by the arresting officers, including that provided to them by the Detroit Police Department Homicide Section. "To prevent arresting officers from acting on the assumption that fellow officers who call upon them to make an arrest have probable cause for believing the arrestees are perpetrators of a crime would, it is argued, unduly hamper law enforcement." *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971). If the totality of the information possessed by the arresting officers does not establish probable cause, then there is a violation of the Fourth Amendment; "an otherwise illegal arrest cannot be insulated from challenge by the decision of the investigating officer to rely on fellow officers to make the arrest." *Id.* at 1037.

 The Court holds that the officers did not have probable cause to arrest Mr. Hurston when they came to the front door and arrested him. An order by a police officer to other officers to bring a citizen in for questioning does not, by itself, pass muster under the Fourth Amendment. See *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), discussed *infra* at pp. 636–637.

Testimony before the Court indicated that the facts possessed by law enforcement officers, *en toto*, when they arrested Defendant were not specific as to any dates, places or times, or victims relating to criminal activity that was tied to Mr. Hurston. What was missing was the officers articulation of "*concrete facts* from which they infer a probability that illegality has occurred." *Strickland, supra* at 413. (emphasis added).

The police had a mere suspicion of criminal activity by Defendant Hurston; not probable cause. He was identified as one of 7 or 8 people to be arrested for questioning. There was no evidence introduced of when any of the alleged criminal activity related to Defendant occurred, where it occurred, or what victim(s) it involved.

 Because there was no testimony specifically mentioning a particular date, a particular place, a particular victim, and a specific crime tied to this Defendant, there was not probable cause to arrest him on October 2,

1997 at 5 a.m., when he came to the door and was arrested. Edwards TR P.98, Mueller TR.P.102. This arrest in violation of the Fourth Amendment was followed by an illegal post-arrest seizure of the first firearm in the kitchen, a minute or so after the arrest. Edwards TR Pp. 58, 59, 77. Those legal determinations as to the illegal arrest and illegal seizure of the first firearm apply, even if the officers subsequently provided Hurston with his *Miranda* warnings at that situs (1) prior to his stating where the other guns were located, and (2) prior to his allegedly consenting to a search of the house.

■ The Court next concludes that the subsequent-to-arrest seizure of those additional six guns, and any post-arrest statements are excludable as the fruit of the illegal arrest. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 2256, 45 L.Ed.2d 416 (1975). *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Government's arguments relating to post-arrest statements by the Defendant, (1) that Defendant consented to their search of the house, and (2) that Defendant told them about additional guns in the bedroom, cannot prevail because both of these statements were connected to the initial illegality—the illegal arrest. There were no "intervening circumstances." *Brown* at 2262.

In *Brown,* the defendant, arrested without probable cause and without a warrant, was given the *Miranda* warnings, and he thereafter, while in custody, made inculpatory statements, *Brown* at 2256. The Court held that the statements were to be excluded as fruits as the illegal arrest, and that the giving of the Miranda warnings a few hours later while Defendant remained in custody at its police department did not sufficiently attenuate the taint of the arrest. In *Brown,* the Supreme Court, citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) stated that:

> In order for the causal claim, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement met the Fifth Amendment standard of voluntariness but that it be "sufficiently

an act of free will to purge the primary taint."

*Brown* at 2261 (citation omitted). Specifically, the Supreme Court held that Miranda warnings, by themselves, do not "attenuate the taint of an unconstitutional arrest." *Id.* In addition to consideration of whether the Miranda warnings were provided to the unlawfully arrested defendant, the Supreme Court, in *Brown,* noted other factors:

> "The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution." *Id.* at 2261–62 (citations omitted).

In the instant case the incriminating statements were made almost at the same time as the illegal 5 a.m. arrest, and there were no intervening circumstances to sufficiently alternate the taint of the arrest.

Further, as the Supreme Court noted in *Brown,* arrests for "investigation," or questioning are not based upon probable cause. *Id. Brown* was reaffirmed in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979), which was a virtual replica of the situation in *Brown:*

> Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance."

*Dunaway* at 2260.

As the Supreme Court noted in *Brown:*

> The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning. The arrest, both in design and in execution, was investigatory."

*Brown* at 2262 (citation omitted).

Even assuming the *Miranda* warnings were given after Mr. Hurston's arrest and prior to his statement regarding other firearms and his alleged consent to search, the Supreme Court, in *Brown,* pointed out, "the

*Miranda* warnings by themselves, under *Wong Sun* [do not necessarily] always purge the taint of any illegal arrest." *Id.* at 2263. In the instant case, given the 5 a.m. forced entry by 7 gun-wielding police, in violation of the Fourth Amendment, even if the Miranda warnings were subsequently provided to Mr. Hurston, the evidence does not establish intervening circumstances that would remove the taint of the illegality so as to permit the introduction of the statements into evidence.

■ Finally, another separate legal ground supports the suppression of the firearms, since the evidence indicates that Mr. Hurston's consent was not voluntary under *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Mr. Hurston had just been arrested and handcuffed after being confronted at the front door at 5 a.m. by 11 police with firearms drawn. In the hectic aftermath of his arrest, his fiancé and her two young children were being rounded up by the police, who had fanned out throughout the house. Simultaneously with this scenario the police, after discovering a firearm in the kitchen, asked his permission to search the house. Unlike *Schneckloth*, in the instant case there is evidence of coercion from the nature of the recent police entry and the environment in which the consent issue took place. *Id.* At 2058. In the instant case all of the circumstances impel the conclusion that Mr. Hurston's consent to search was not given voluntarily.

## II. *Background facts as to Ms. Gwen Vincent:*

An alternative argument by the Government in support of the seizure of the firearms is that a valid consent to search was given by Ms. Gwen Vincent, Defendant's fiancé, who occupied the home with her two young children, five and two years old respectively.

■ The Court has concluded that there is not evidence in the record establishing that Ms. Vincent signed the consent-to-search form prior to the search of the bedroom closet that produced the six additional firearms. Thus, the search, conducted without her valid consent, was in violation of the Fourth Amendment. Further, even if Ms. Vincent voluntarily signed the consent to search form after the firearms were found (the Court does not find her consent voluntary), that subsequent consent to search does not validate the prior illegal search.

Accordingly, since there is not evidence establishing that the consent to search form was signed prior to the search, the Government cannot justify the search on its argument that Ms. Vincent could and did properly consent to the search. Thus, the Court need not resolve the issue of the validity or voluntariness of her consent to search. Nevertheless, to complete the Court's view of the instant occurrence, the Court will proceed to discuss that issue.

Ms. Vincent testified to the following facts:

1. At about 5 a.m. on October 2, 1997, she heard a loud banging on the front door. TR. P. 8.

2. She awoke Mr. Hurston who, wearing boxer shorts; he ran toward the front of the house. TR. P. 8.

3. She was wearing a negligee, grabbed her bathrobe, and rushed toward the front of the house. TR. P. 9.

4. As she walked into the hallway about 10 police officers approached "pointing guns in my fact from all directions of the room, screaming stop." TR. Pp. 9–10.

5. She was "screaming, my babies are in the house [in their rooms]. Please don't shoot." TR. P. 10.

6. The officers said they were aware of the children, and "made me go to the rear of the house, the family room," where she was joined by officers. TR. P. 11.

7. The officers kept asking me "where is the dope? Where is the money at?" TR. P. 11.

8. "I kept ... begging them to call my aunt for my kids, and they would not let me." TR. P. 11.

9. As soon as the officers walked in the door they began searching her home. TR. P. 11.

"I could see from the family room in my bedroom. I could see them in the closet, in the drawers, and I could hear them all over the house." TR. Pp. 11–12.

10. When the officer gave her the consent form to sign, the police were at that time "tearing up the home." TR. P. 12.

11. Ms. Vincent then introduced photographs of her house that she took immediately after being released by the police; she stated: "they came in and tore my house apart." TR. P. 15.

12. When one of the officers said "sign this so we don't tear up your house," she felt "scared," "Because they had my children in the other room and would not let me see my kids, and would not tell me what was going on with Andre." TR. P. 23.

13. At the time they asked her for consent to search the house, they were already searching the house. TR. P. 24.

14. In response to the question "Why did you sign the form/, Ms. Vincent testified:

I didn't know what it was, and I was scared. I kept asking where the babies were. They said, I was upsetting them. They are okay. He is okay. He is making sure that they are all right, and they would not let me call anybody else. They would not, I kept asking to call my aunt, and they would not let me call anybody else to find out what was going on." TR. Pp. 24–25.

. . .

"My oldest daughter was crying when they originally busted in the house. She was crying." TR. P. 25.

"I was upset. Crying on the floor, praying." TR. P. 25.

14. She testified that she did not read the signed consent form, and that it was not read to her. TR. P. 25.

15. After the first hour the police were there, when her sister came, they let her call her aunt and get her children out of the house. TR. P. 29.

16. In response to the question of the Assistant U.S. Attorney whether she could have read the document when she signed it, she responded:

"I guess I could have had he not put it in my face and take [sic] it away." TR. P. 32.

17. Ms. Vincent also testified that although the signed document says "consent to search," the police did not tell her it was a consent. TR. P. 33.

18. "They told me to sign it so they won't tear up my home." TR. P. 34.

With regard to Ms. Vincent, Officer Edwards testified:

1. "Mr. Hurston's wife was in the den, and I believe the children were brought to her, if I am not mistaken." TR. P. 60.

2. "Q. Do you know if they searched before the consent was signed?

A. I don't know." TR. P. 61.

3. His partner, Special Agent James Mueller had Ms. Vincent read the consent form out loud, asking her permission to search the house. TR. P. 61.

4. He testified that Ms. Vincent appeared "pissed off, mad." TR. P. 62.

5. He testified that after S.A. Mueller read Ms. Vincent the form, she asked "what is this for? He explained what the form was for." TR. P. 78.

6. He testified that he heard her read the form and that she then signed it. TR. P. 78.

7. She signed the form after the gun was found—no more than five minutes after they entered the house. TR. P. 79.

8. "[O]ne of the kids was crying . . ." TR. P. 79.

9. After they searched for other people, one of the kids that was crying

was brought to her. Then, within minutes, the other child was brought to her. TR. Pp. 79–80.

10. "Q. And do you know while Ms. Vincent was getting the purported signature on consent form, other officers were going through the house, is that correct?

A. While getting the consent form?

Q. Or sometime prior?

A. Prior to that, other officers were yelling through the house. As I stated, as far as other persons, I am sure other officers went to the basement." TR. Pp. 88–89.

With regard to Ms. Vincent, Special Agent James Mueller testified:

That he encountered Ms. Vincent two or three minutes after the officers entered the house; he didn't enter immediately. TR. P. 104.

### III. *Legal Discussion as to Ms. Gwen Vincent:*

The Supreme Court has held that a warrantless entry and search by the police does not violate the Fourth Amendment if they have obtained the voluntary consent of a third party who possesses common authority over the premises. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 2796–97, 111 L.Ed.2d 148 (1990). The prosecution must show that the third party possessed common authority over the premises sought to be inspected. *U.S. v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). In the instant case, the evidence presented at the suppression hearing established that Ms. Vincent possessed authority over the premises—she lived there with her two children and Mr. Hurston.

The prosecution must also prove that Ms. Vincent voluntarily consented to the search. The Supreme Court stated in *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968):

When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be dis-

charged by showing no more than acquiescence to a claim of lawful authority.

Accord, *Matlock,* 94 S.Ct. at 991, *United States v. Moore,* 917 F.2d 215, 223 (6th Cir. 1990). In the instant case, the prosecution has not proven that Ms. Vincent's consent was freely and voluntarily given.

The prosecution does not have to prove that she knew of the right to refuse consent in order to establish that the consent was voluntary. *Id.* at n. 2, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In the instant case, the Court concludes that the evidence does not establish that Ms. Vincent voluntarily consented to the search of her home after the 5 a.m. forced entry of her home by at least 8 officers with guns drawn who immediately began searching the house before the form was presented to her for signing. Further, the evidence indicates that the police had been in the process of sweep searching the house before the consent was signed. There is no evidence establishing that she gave her consent before the 6 additional firearms were found.

The Court's conclusion that the "consent to search" given by Ms. Vincent, was not voluntary is supported by the facts testified to at the suppression hearing. The "consent" occurred when eleven armed officers had already been searching her house from the time they entered. Vincent, TR. P. 11. Her young children were crying, she was highly distressed, and she testified that the police were threatening to wreck her house if she did not sign the consent. Vincent TR 23. Ms. Vincent further testified that the officers refused her "begging" to allow her to call her aunt to pick up her young children. Indeed, Officer Edwards testified that prior to Ms. Vincent signing the consent form "other officers were yelling through the house." Edwards TR. P. 89.

The Court finds that the 5 a.m. armed search by 11 officers with firearms drawn was a startling, frightening experience for Ms. Vincent and her two young children. The Court credits her testimony with regard to the shock value of the incident, and the Court further notes that there was no evi-

dence of any significant intervening circumstance that would have allowed a rational voluntary consideration of the police request to search. There was conflicting testimony over whether the form was read to her, whether she read it, or whether it was merely placed before her and she signed it to stop the officers from tearing up her house. At the same time, there was no conflicting testimony about the hectic scene at her house in those first minutes after the 5 a.m. police entry.

Further, this was not a situation where the evidence established two separate searches, a first sweep that did not produce evidence, followed by a voluntarily signed consent, and then a second search that produced the six additional firearms.

Accordingly, unlike *United States v. Calhoun*, 49 F.3d 231, 234 (6th Cir.1995), where there was evidence of an unauthorized sweep, thereafter followed by a voluntary consent to search, and a second search, the instant facts do not indicate two separate searches.

In the instant case, the Court does not find a "voluntary consent" and "freely signing the consent form" as the Court found in *Calhoun*. Thus, for both of these reasons, *Calhoun* is not controlling here. As the Sixth Circuit stated in *Calhoun*:

> Generally, it can be said the validity of a person's consent "is a question of fact to be determined from the totality of the circumstances."

*Calhoun* at 234–35, (quoting *U.S. v. Taylor*, 956 F.2d 572, 577 (6th Cir.)) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973)). In the instant case, unlike *Calhoun*, there is no evidence that the police allowed Ms. Vincent "to attempt to contact friends or relatives who might take care of the" babies before she signed the consent form. *Calhoun* at 235. Accordingly, the Court concludes that Ms. Vincent's consent to search was not voluntary.

ORDER: For the aforestated reasons, the Court grants Defendant's Motion to Suppress his statements made at the house and all of the firearms seized at the house subsequent to his illegal arrest.