**UNITED STATES of America,**
**Plaintiff,**

v.

**Jesus M. BARRAZA, Defendant.**

**No. 3:05CR024.**

United States District Court,
S.D. Ohio,
Western Division.

Dec. 5, 2005.

Sheila Gay Lafferty, United States Attorney's Office, Dayton, OH, for Plaintiff.

Anthony Comunale, Comunale Law Office, Dayton, OH, Robert R. Harris, El Paso, TX, for Defendant.

## DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. # 18)

RICE, District Judge.

The Defendant is charged in the Indictment (Doc. # 10) with three offenses relating to the possession with intent to distribute more than 100 kilograms of marijuana. The Defendant has filed a motion, requesting that the Court suppress any evidence seized from him and statements made by him after he had been arrested on February 3, 2005. *See* Doc. # 18. On July 11, 2005, the Court conducted an oral and evidentiary hearing on that motion. The Court established a briefing schedule, under which the parties were required to file simultaneous post-hearing memoranda 21 days after the filing of the transcript of that hearing, and were afforded the opportunity of filing reply memoranda 14 days thereafter. *See* Doc. # 21. The transcript has been filed. *See* Doc. # 22. In addition, after having obtained two extensions of time, the Government has filed its Post–Hearing Memorandum. *See* Doc. # 27. The Defendant, in contrast, has neither filed such a memorandum nor requested an extension of time in which to do so. Therefore, the Court rules upon the Defendant's Motion to Suppress Evidence (Doc. # 18), without the benefit of further argument from him.[1]

On February 3, 2005, Detective Kevin Bollinger ("Bollinger") of the Dayton Police Department, who was assigned to a DEA Task Force, was contacted by an employee of The Expediting Company, a freight forwarder located in Vandalia, Ohio.[2] That person told Bollinger that he (Bollinger) might be interested in a shipment sitting on the dock at The Expediting Company, waiting to be picked up. The officer visited that commercial establishment at least two or three times a week and had made a number of seizures there in the past. He had asked employees of The Expediting Company to look out for packages which were being held for pickup that had been shipped to Dayton from the Western or Southwestern parts of the United States. The shipment which Bollinger was called about on that date met that description.

---

1. The Court will, of course, consider the arguments of the Defendant, set forth in his motion, as well as those set forth in the supporting memorandum he filed before the evidentiary hearing. *See* Docs. ## 18 and 19.

2. The Expediting Company receives freight shipments from a number of companies, which it then distributes to customers throughout Southwestern Ohio. Bollinger had previously made a number of seizures of controlled substances at that location.

As a consequence, Bollinger and his trained and certified drug detection dog, Nicholas, traveled to The Expediting Company. The shipment in question consisted of two four foot by four foot wooden pallets, on which a total of eleven plastic containers had been stacked. Each container was locked and some of them were so new that their price tags had not been removed. The airbill that had accompanied the shipment indicated that it had originated at Great American Music in El Paso, Texas, and had been sent to Creative Music in Dayton. Bollinger then called his supervisor to ask that computer checks be run on the two businesses listed on the airbill. He also got Nicholas from his vehicle. When Bollinger walked his drug detection dog around the suspect shipment, the canine alerted by scratching and biting the freight, thus indicating that he could smell narcotics inside the plastic containers. Bollinger then called his supervisor, told him about the alert by Nicholas and asked that additional officers be sent to that location. Bollinger wanted the additional officers to watch the eleven plastic containers while he prepared an affidavit to secure a warrant, authorizing officers to search those containers.[3]

As a consequence, Detectives Thomas Lubonovic ("Lubonovic") and Roger Rockwell ("Rockwell") were dispatched to The Expediting Company. Like Bollinger, Rockwell brought his trained and certified drug detection dog, Rusty. Rockwell walked his dog around the plastic containers on the two wooden pallets and that canine alerted on them, as had Nicholas, also indicating that controlled substances were inside the containers.

As Bollinger and Lubonovic were watching Rockwell walk his dog around the eleven containers on the two wooden pallets, Bollinger observed another individual, who was subsequently identified as the Defendant, at the west end of The Expediting Company's warehouse, having a conversation with a dock worker. Upon seeing the officers, the Defendant hurriedly left the building. After the Defendant had left, the dock worker told the officers that the individual had been inquiring about the suspect shipment (i.e., the two wooden pallets with the eleven plastic containers on them) and had displayed an airbill for that shipment. Upon learning that information, Lubonovic left the building, following after the Defendant. When he got to the parking lot, Lubonovic saw a white van parked with its engine running and the Defendant sitting in its driver's seat. That van was the only vehicle in the parking lot. Lubonovic walked to the driver's side of the van and immediately recognized the driver as an individual he had confronted at the Dayton Airport approximately six weeks previously.[4] Lubonovic then identi-

3. During this conversation, the supervisor told Bollinger that the computer check had failed to reveal any information on either business.

4. In December, 2004, employees of Northwest Airlines had informed Lubonovic that an individual had used cash to purchase a one-way ticket to fly to Minneapolis. The officer approached that individual, who Lubonovic later determined was the Defendant, and his traveling companion, a Mr. Cruise, in the concourse of the Airport. The Defendant told the officer that he was a Mexican citizen, living in Juarez, and that he had arrived in Dayton three days earlier for a vacation. He also explained that he purchased and sold used cars and that he might buy a car while on vacation. The Defendant explained that he was going to continue his vacation for a day in St. Paul, Minnesota, before returning home. Throughout his conversation with Lubonovic, the Defendant had been cooperative and had provided detailed information. After the Defendant and his companion had left Lubonovic to catch their flight, Lubonovic stopped at the Airport police office, before returning to the Northwest ticket counter. When Lubonovic arrived at that counter, the

fied himself as a police officer, opened the door to the van and asked the Defendant what he was doing in the parking lot. The Defendant explained that he was looking for his girlfriend who worked in a warehouse in the area. The officer then told the Defendant to get out of the van and turned off the engine of that vehicle.

Shortly after Lubonovic had left the warehouse, Bollinger followed his fellow officer out the same door.[5] When Bollinger got outside, he saw Lubonovic on the passenger's side of a white van which was parked at the far west side of the parking lot of The Expediting Company and the Defendant on the driver's side of that vehicle. Lubonovic told Bollinger that he was familiar with the Defendant and asked his fellow officer for handcuffs. Thereafter, Lubonovic placed the Defendant under arrest, put handcuffs on him and read him the *Miranda* warnings. When he searched the Defendant, Lubonovic discovered a copy of the airbill for the eleven plastic containers, which was identical to the one that had accompanied them.[6] A Vandalia police officer then transported the Defendant to the Vandalia Police Department.

Subsequently, Lubonovic and Rockwell drove to that police department. They met the Defendant in the booking area of that facility, where they interviewed him for approximately one hour. The Defen-

dant told the officers that someone who called himself Fatty had telephoned him in Mexico, explaining that he had gotten Defendant's telephone number from a mutual friend. Fatty had asked Defendant to go to Dayton in order to pickup a package. The package was said to contain electronics, and Defendant was to be paid $1000.00 for his efforts. Defendant had then been driven to El Paso, where he used cash to purchase a one-way ticket to Dayton. When he had arrived in Dayton, Defendant had taken a taxi to the Red Roof Inn. While at that motel, Fatty had called him again, asking him where he was staying. The next day, Fatty again called and explained that a van was parked at that establishment, with the keys in it. Defendant had then driven the van to The Expediting Company in order to retrieve the shipment. Since he had not been told where the shipment was to be delivered, Defendant planned to look up the address in a telephone book.[7] Lubonovic also requested that the Defendant execute a document, giving officers consent to search his room at the Red Roof Inn. Defendant knowingly and voluntarily signed the document. When that room was searched, officers discovered a ticket stub for a flight from El Paso. Near the end of his interrogation of the Defendant, Lubonovic provided him a written document, setting forth the *Miranda* warnings.[8] The Defendant

Defendant and his companion were there. The Defendant explained that his companion had learned that his mother had had a heart attack, necessitating their immediate return to Mexico.

5. Bollinger had telephoned the Vandalia Police Department before leaving.

6. Lubonovic also discovered a piece of stationary from the Red Roof Inn on Defendant's person.

7. It is difficult to understand how the Defendant would be able to learn the address to

which the shipment had to be delivered by using a telephone book, given that he had not been told where the shipment was to be delivered. The record does not shed light on that question.

8. Lubonovic had not provided that document to the Defendant earlier, because he did not have such a document with him when he arrested the Defendant.

refused to sign that document; however, he had previously agreed orally to speak with Lubonovic.

While Lubonovic and Rockwell were interviewing the Defendant, Bollinger obtained a warrant, authorizing the plastic containers to be searched. Approximately 420 kilograms of marijuana was discovered inside the containers.

In his motion and memorandum in support (Docs. ## 18 and 19), Defendant argues that the Court should suppress the evidence seized from him and the statements he made after his arrest on February 3, 2005, because that arrest was not supported by probable cause.[9] This Court cannot agree.

In *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the Supreme Court held that a warrantless arrest of an individual in a public place does not violate the Fourth Amendment if, at the time of the defendant's arrest, the police had probable cause to believe that he has committed, is or will be committing an offense. In *United States v. Dotson,* 49 F.3d 227 (6th Cir.), *cert. denied,* 516 U.S. 848, 116 S.Ct. 141, 133 L.Ed.2d 87 (1995), the Sixth Circuit restated the test which must be applied to determine whether a warrantless arrest was lawful:

> The Supreme Court has held that the test for whether an arrest is constitutionally valid is "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *see United States v. Thomas,* 11 F.3d 620, 627 (6th Cir.1993), *cert. denied,* 511 U.S. 1043, 114 S.Ct. 1570, 128 L.Ed.2d 214 (1994).

*Id.* at 230. In *United States v. Strickland,* 144 F.3d 412 (6th Cir.1998), the Sixth Circuit explained that "there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the factual and practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred." *Id.* at 415. The Sixth Circuit has further explained that probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir. 1995) (internal quotation marks and citation omitted). Moreover, " 'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *United States v. Wright,* 16 F.3d 1429, 1438 (6th Cir.) (quoting *Illinois v. Gates,* 462 U.S. 213,

---

**9.** In his motion and supporting memorandum, the Defendant did not mention the ticket stub that had been discovered by officers when they searched his room at the Red Roof Inn. Defendant may be of the opinion that the Court should suppress that evidence, independent of his argument that officers lacked probable cause to arrest him. In particular, Defendant may be challenging the proposition that he consented to the search of his motel room. This Court would reject such an argument. It is axiomatic that, when the Government relies upon consent to justify a warrantless search, it has the burden of proving by the preponderance of the evidence that the defendant in fact consented and that his consent was freely and voluntarily given. *See e.g., United States v. Carter,* 378 F.3d 584, 593 (6th Cir.2004) (*en banc* ), *cert. denied,* 543 U.S. 1155, 125 S.Ct. 1298, 161 L.Ed.2d 121 (2005). This burden has been met, as this Court has found that the Defendant freely and voluntarily executed a document, giving officers consent to search his motel room.

244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)), *cert denied*, 512 U.S. 1243, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994). Whether probable cause existed must be determined by examining the collective knowledge of the police. *Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003); *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir.1989); *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir.1979). Moreover, the determination of probable cause requires an examination of the objective reasonableness of the facts, with the officers' subjective intentions being irrelevant. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Of course, the Government has the burden of proving that probable cause existed. *United States v. Porter*, 701 F.2d 1158 (6th Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

Herein, Lubonovic had probable cause to arrest Defendant for an offense relating to controlled substances. As an initial matter, before Defendant had been arrested, officers had probable cause to believe that the eleven plastic containers on the two wooden pallets at The Expediting Company contained controlled substances. Two trained and certified drug detection dogs had alerted on those containers, indicating that controlled substances were contained therein. The Sixth Circuit has repeatedly held that a positive alert on something by a trained drug-detection dog is sufficient to establish probable cause to believe that a controlled substance is located inside that item. *See e.g., United States v. Robinson*, 390 F.3d 853, 874 (6th Cir.2004). In addition, officers had probable cause to believe that the Defendant had come to The Expediting Company in order to pick up those containers. The Defendant was seen in the warehouse at that commercial establishment, inquiring about the suspect shipment. Indeed, he had showed a copy of the airbill for that shipment to an employee of The Expediting Company. Moreover, Lubonovic had previously interacted with the Defendant under suspicious circumstances at the Dayton Airport.

Accordingly, the Court concludes that the Defendant's arrest was supported by probable cause. It is settled that officers may search an individual, after they lawfully arrest him. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Therefore, there is no basis for suppressing the evidence seized when the Defendant was searched after having been arrested. As is indicated above, the Defendant has also moved to suppress his post-arrest statements. Although he has not argued that his statements should be suppressed, because the Government violated the rule established in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), this Court will briefly set forth its reasons for finding that the Government did not violate *Miranda*.[10]

During the suppression hearing, the Defendant testified that Lubonovic did not provide the requisite warnings to him, before interrogating him, and the officer testified to the contrary. This Court credits the testimony from Lubonovic, rather than that from the Defendant. Therefore, it finds that the Defendant was given the requisite *Miranda* warnings and that he knowingly and voluntarily waived his rights before the interrogation began. *See Colorado v. Connelly*, 479 U.S. 157, 107

---

**10.** The Defendant may be of the opinion that the Court must suppress his statements in accordance with the fruit-of-the-poisonous-tree doctrine, the poisonous tree being his illegal arrest. Since this Court has concluded that the arrest of the Defendant was supported by probable cause, it rejects the argument that his statements constituted fruit of an illegal arrest.

S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that the Government must prove by the preponderance of the evidence that the defendant knowingly and voluntarily waived his rights). Simply stated, the Court finds that the Defendant was not a credible witness. Without being exclusive, the Court notes that, although the Defendant has indicated that he does not have a complete understanding of English, he demonstrated the opposite during the suppression hearing, by answering a number of questions posed to him in English, before the interpreter had finished reciting such questions into Spanish. Moreover, there was simply no reason for Lubonovic to fabricate his testimony about giving the *Miranda* warnings to the Defendant. The only inculpatory aspect of Defendant's statement to Lubonovic, as testified to by that officer, is confirmation that he (Defendant) had come to The Expediting Company in order to retrieve the suspect shipment. However, before questioning the Defendant, the officer had seized physical evidence from the Defendant, a copy of the airbill for that shipment, which tied him to the marijuana more closely than his statement to Lubonovic. Therefore, the Defendant's statement in that regard could hardly be considered a necessary element of the Government's case against the Defendant.

Based upon the foregoing, the Court overrules the Defendant's Motion to Suppress Evidence (Doc. # 18).