NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0451n.06

No. 16-2063

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 01, 2017
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

DOMINICK T. JOHNSON,

     Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

_____/

BEFORE:    CLAY, GRIFFIN, and THAPAR, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Dominick Johnson ("Defendant") appeals from the judgment of conviction and sentence entered by the district court on July 19, 2016, sentencing him to 872 months in prison for: (i) one count of conspiracy to commit bank robbery, *see* 18 U.S.C. §§ 371 & 2113(a); (ii) two counts of armed bank robbery with forced accompaniment, *see* 18 U.S.C. § 2113(a), (d), & (e); (iii) one count of armed bank robbery, *see* 18 U.S.C. § 2113(a) & (d); and (iv) three counts of brandishing a firearm during and in relation to a crime of violence, *see* 18 U.S.C. §§ 924(c)(1)(A)(ii) & (2). Defendant raises a litany of challenges related to the district court's denial of his motions to suppress, the sufficiency of the evidence introduced against him, the jury instructions for his trial, and the reasonableness of the district court's sentence. We have jurisdiction over this appeal pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291. For the reasons set forth below, we **AFFIRM** Defendant's convictions and sentence.

**BACKGROUND**

I.     **Factual History**

This case arises out of a series of bank robberies committed by Defendant and his younger half-brother, Nathan Benson ("Benson"), in western Michigan in 2014 and 2015. Benson pled guilty to his role in the robberies and testified against Defendant. The following is a summary of the evidence introduced against Defendant at trial.

In late 2013, Defendant approached Benson and said that he knew of "a good spot" to rob in Michigan, which turned out to be the Galesburg, Michigan branch of PNC Bank. Defendant stated that he was familiar with the bank through his work as a caretaker for an older man named Kim Morgan, who banked at that branch, and thus knew the bank's layout and the number of employees who would be inside. In February of 2014, Benson traveled to Michigan from his residence in Chicago, Illinois to further plan the robbery with Defendant. The brothers agreed that Benson would hold up the bank using a firearm, while Johnson waited as the getaway driver in the parking lot of a nearby church. Benson subsequently returned to Chicago and purchased a revolver and ammunition from a drug dealer.

On May 29, 2014, Benson rented a car in Chicago and drove to pick up Defendant in Kalamazoo, Michigan. Cell phone records introduced at trial confirm that Defendant and Benson spoke that morning, and that Benson made the trip to Kalamazoo. After Benson picked up Defendant, the brothers drove to the PNC Bank to commit the robbery. As Benson went inside to rob the bank, Defendant called Benson's cell phone to keep an open channel of communication during the robbery. Cell phone records introduced at trial confirm that this call occurred and that the cell phone used to make the call was near the bank during the robbery. Benson then entered and robbed the bank at gunpoint, making off with roughly $40,000 in cash. The brothers celebrated the robbery by going on a shopping spree at a local mall. Benson then returned to Chicago via train, and Defendant drove the rental car back to Chicago the next day.

After the successful PNC robbery, Defendant approached Benson a few weeks later about committing a second robbery at the Comstock Township, Michigan branch of Comerica Bank. On July 29, 2014, Benson again rented a car and drove Defendant to Kalamazoo, bringing a firearm that Benson had purchased from a Chicago store. Cell phone records confirm that Defendant's cell phone traveled from Chicago towards Kalamazoo on that morning. While Defendant waited in the rental car, Benson robbed the Comerica Bank at gunpoint, making off with roughly $80,000 in cash.

Having again succeeded, the brothers decided to attempt another robbery in October 2014. On October 7, 2014, after purchasing masks, clothing, and firearms for this robbery, Defendant and Benson drove to Indiana to steal a license plate. Their plan was thwarted when they were pulled over by an Indiana police officer for a traffic violation, and subsequently arrested for unlawfully carrying a concealed weapon. The Indiana officer discovered and seized two loaded semiautomatic pistols, a black bag, garbage bags, gloves, black outwear, and a ski mask from the brothers' vehicle.

Despite this setback, Defendant and Benson insisted on pressing their luck once more. On January 8, 2015, Defendant borrowed a car from an associate in Chicago and traveled to the Kalamazoo area. The car was installed with a GPS tracker, which confirmed that the trip occurred. Once in Michigan, Benson robbed the Old National Bank's Kalamazoo branch at gunpoint, taking roughly $8,000 in cash from a teller's station. As with the first robbery, Defendant placed an open cell phone call to Benson during the robbery so that the brothers could maintain an open communication channel. Cell phone records confirm this call, and that Defendant's cell phone was near the Old National Bank during the robbery.

As Benson was fleeing the scene of the crime, a dye pack hidden within the cash exploded, forcing him to abandon the robbery's proceeds. Defendant and Benson then sped off in their borrowed vehicle, eventually sliding off the road in a neighborhood near the crime scene due to snowy conditions. As the brothers got out of the vehicle to push it back onto the road,

Defendant dropped a Wendy's cheeseburger that he had been eating onto the snow. Subsequent testing found Defendant's DNA on the cheeseburger.

Undeterred, Defendant and Benson planned yet another robbery and set out to execute it on February 18, 2015. However, this attempt was also thwarted when wintery conditions caused Defendant to get into a traffic accident.

On the heels of three consecutive failed robbery attempts, Benson had finally had enough, and refused to participate in any further robberies. Defendant was undaunted, however, and recruited three other men—Tony Walker, Phillip Shelton, and David Green—to mount yet another robbery attempt. Defendant also attempted to recruit a fourth man, Laron Swift, but Swift declined to participate, and instead notified the FBI of Defendant's plan.

Subsequently, the FBI obtained a federal warrant to track the location of Defendant's cell phone. On February 27, 2015, Defendant's cell phone data alerted the FBI that he was once again in Kalamazoo. Fearing that another robbery was imminent, the FBI coordinated with local law enforcement to find Defendant's exact location. Officers subsequently observed two men in orange vests sitting in an SUV parked behind the Kalamazoo branch of Comerica Bank. The SUV left the parking lot, and was followed by a state trooper. As the SUV moved, Defendant's cell phone was recorded as moving along the same road in the same direction. The trooper and his commanding officer decided to wait to see if the vehicle committed any traffic violations before pulling it over. After a number of minutes, the trooper observed the SUV following another vehicle too closely, and crossing over the road's fog line. The trooper then initiated a traffic stop.

Inside the SUV were Defendant, Shelton, Walker, and Green. Defendant was arrested because he was subject to an outstanding warrant[1] and taken to the Van Buren County Jail. A K-9 unit was brought to the scene and alerted to the vehicle. A subsequent search found a firearm

---

[1] Defendant was subject to an arrest warrant for taking a vehicle out of an impound yard without paying the necessary fees.

in the SUV.  Walker and Shelton subsequently testified that Defendant recruited them for the robbery, and that they had planned to rob the Comerica Bank, but got cold feet at the last minute and were driving back to Chicago when the trooper initiated the traffic stop.

On March 31, 2015, Defendant was interviewed about the robberies by FBI Agent Brent Johnson and Detective Bill Sperrel[2] of the Kalamazoo County Sheriff's Department at the Van Buren County Jail.  As the district court recounted:

> At the beginning of the interview, the agent and the detective introduced themselves and said that they wanted to talk to Defendant.  Defendant said, "I don't know what this is about," and the agent and the detective told Defendant that they would explain why they were there.  The agent told Defendant that they were not there to talk about why Defendant was currently in jail and did not want to discuss anything about the circumstances of that case.  Defendant then responded, "I need an attorney present.  I don't have anything to say.  I don't know what this is about."  The agent said, "We can explain that, but since you said you want an attorney present, you know, we'll stop that, unless you want us to explain what this is about, and we can do that."  Defendant then asked, "Are you trying to charge me with something, because I ain't . . .," at which point the detective said, "Eventually?  The answer is yes."
>
> The agent told Defendant that they would explain what the case was about if he wanted them to do that, but noted that Defendant had said that he wanted an attorney present.  Defendant then asked what the case was about, and the detective responded, "either you want an attorney present first, or not, I mean, at any time you can exercise your rights."  The detective presented Defendant an advice of rights form, *see Miranda v. Arizona*, 384 U.S. 436 (1966), to review so that everyone was "very clear" on Defendant's wishes.  The detective asked Defendant to read the rights aloud, but Defendant instead insisted on knowing what the meeting was about.  After the detective and the agent told Defendant that they could proceed to discuss the case only after he signed the form, Defendant said, "Yeah, I understand my rights."  The agent then read aloud each of the rights listed on the form, and Defendant verbally confirmed that he understood them.  Defendant persisted in his effort to find out why the agent and the detective were there to talk to him, but the agent advised Defendant that they needed to get through "step one"—having Defendant sign the advice of rights form—before they could talk to him about the case.  The agent and the detective both reiterated that Defendant did not have to talk to them and that Defendant could invoke his right to an attorney and stop the interview at any time.

---

[2] There appears to be some confusion in the record regarding the name of the Kalamazoo County Detective that participated in the March 31, 2015 interview.  Because the parties refer to this person as Detective Sperrel in their briefing, we will do so as well.

> After Defendant asked additional questions about the case the agent and the detective were investigating, Defendant signed the waiver form. The agent then explained that by signing the form, Defendant acknowledged that he waived his rights and was willing to talk to them without a lawyer, but that he could request one at any time. The agent and the detective then proceeded to interview Defendant for approximately two and one-half hours.

(R. 70, PageID #210–12.)

During his conversation with Agent Johnson and Detective Sperrel, Defendant made several statements that were later introduced by the government at trial, including statements: (i) confirming his height (6'7"); (ii) denying being near the Comerica Bank on February 27, 2015; (iii) asking if he could get a "deal;" (iv) stating that he was in Michigan to attend a funeral on February 18, 2015; (v) denying ever having been in a rental car prior to the October 7, 2014 traffic stop; (vi) telling the agents the dates he worked as Morgan's caretaker; and (vii) admitting that he had once taken Morgan to the PNC Bank that was robbed.

## II.    Procedural History

Defendant was subsequently indicted in the Western District of Michigan for: (i) aiding and abetting the robbery of the PNC, Comerica, and Old National Bank branches; (ii) aiding and abetting the brandishing a firearm during the aforementioned robberies; and (iii) conspiring to commit the three successful and three aborted robberies described above. Prior to trial, Defendant filed two motions to suppress that are relevant to this case. First, Defendant moved to suppress all evidence recovered from the February 27, 2015 traffic stop, arguing that the trooper that initiated the stop lacked the reasonable suspicion of criminal activity required by *Terry v. Ohio*, 392 U.S. 1 (1968). Second, Defendant moved to suppress the statements he made during his March 31, 2015 interview, arguing that the police violated his *Miranda* rights by refusing to cease their questioning when Defendant asked to speak with an attorney. The district court denied both motions. Defendant then proceeded to trial and was convicted on all counts. The district court sentenced Defendant to 872 months' imprisonment on July 19, 2016. Two days later, Defendant filed a timely notice of appeal.

## DISCUSSION

### I.    Motions to Suppress

#### A.    Standard of Review

"In reviewing the denial of a motion to suppress, this Court reviews findings of fact for clear error and conclusions of law *de novo*." *United States v. McMullin*, 739 F.3d 943, 944 (6th Cir. 2014); *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007). "A 'finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Atkins*, 843 F.3d 625, 632 (6th Cir. 2016) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "Under this standard, if 'the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* (quoting *Anderson*, 470 U.S. at 574). "Furthermore," in conducting our review, "the evidence must be reviewed 'in the light most likely to support the district court's decision.'" *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006) (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)).

#### B.    Fourth Amendment Challenge

##### 1.    Governing Law

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry*, 392 U.S. at 9). "Because the 'balance between the public interest and the individual's right to personal security,' *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be

afoot.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 770 (6th Cir. 2004).

When assessing whether officers had a reasonable suspicion sufficient to initiate a traffic stop, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, *Terry*, 392 U.S. at 27, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.*

## 2. Analysis

Defendant first argues that the district court erred in denying his motion to suppress the evidence recovered from the February 27, 2015 traffic stop. Prior to initiating that stop, the state trooper on the scene conversed over the radio with his lieutenant, and the two officers decided to wait until Defendant and his co-conspirators committed a traffic violation before initiating the stop. Defendant argues that this conversation was, in effect, an admission that that the officers lacked a reasonable suspicion that Defendant was involved in wrongdoing, and that therefore the stop was illegal.

We reject Defendant's argument. Under the "collective knowledge doctrine," we take into account all of the information available to the law enforcement personnel investigating Defendant in determining the legality of the stop, without myopically focusing on the information available to the trooper that initiated the stop. *Arvizu*, 534 U.S. at 273; *United States v. Lyons*, 687 F.3d 754, 767–68 (6th Cir. 2012) (collecting cases). At the time the traffic stop was initiated on February 27, 2015, the FBI and the Kalamazoo County Sheriff's Department

knew: (i) from Laron Swift that Defendant was recruiting men to help rob a bank in the Kalamazoo area in early 2015; and (ii) from cell phone tracking data that Defendant was near the Kalamazoo branch of Comerica Bank, which had recently been robbed; (iii) that an SUV containing several men had been spotted loitering outside of Comerica Bank; and (iv) that when that SUV moved, Defendant's cell phone data showed that he was moving on the same roads and in the same direction as the SUV. This was more than sufficient information for law enforcement to develop a reasonable suspicion that Defendant was in the SUV, and that he had recently been involved in a plot to rob the Kalamazoo branch of Comerica Bank. We therefore hold that the traffic stop was justified by a reasonable suspicion that wrongdoing was afoot.

## C. *Miranda* Challenge

### 1. Governing Law

The Constitution's Fifth Amendment provides that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. We have explained that:

> To the ends of protecting that right, *Miranda* requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating individuals whom the officers have placed "in custody." *Stansbury v. California,* 511 U.S. 318, 322 (1994) (internal quotation marks omitted). In drawing the line between a non-custodial encounter between a citizen and the police (where *Miranda* does not apply) and a custodial encounter (where it does), courts consider "all of the circumstances" surrounding the encounter, with "the ultimate inquiry" turning on whether "a formal arrest" occurred or whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotation marks omitted). To answer this question, courts focus on the "objective circumstances of the interrogation," *id.* at 323, to determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action," *id.* at 325 (internal quotation marks omitted). Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions. *See United States v. Swanson,* 341 F.3d 524, 529 (6th Cir. 2003).

*United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). Additionally, the Supreme Court has held "that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

### 2. Analysis

Defendant argues that the district court should have suppressed the statements he made during his March 31, 2015 interview because the police continued questioning him after he invoked his right to counsel. The district court denied the motion to suppress because it found that Defendant was not "in custody" for *Miranda* purposes, and that even if he was, he did not unambiguously ask for an attorney to be present. We need not reach the question of whether Defendant was "in custody," because we hold that the police did not violate Defendant's Fifth Amendment rights under the facts presented here.

The uncontested facts found by the district court show that after Agent Johnson and Detective Sperrel initiated the interview and introduced themselves, Defendant unequivocally invoked his right to counsel by saying: "I need an attorney present." However, immediately after this invocation, Defendant went on to express concern as to why he was being questioned by the FBI. At that point, Agent Johnson and Detective Sperrel (appropriately) explained that they could not interrogate Defendant because he had asked for an attorney, but offered to explain why they had come to talk with him. Defendant responded by repeatedly asking why the officers had come to interview him. The officers then presented Defendant with an advice of rights form, read the form out loud, and told Defendant that they could only continue discussing the case if Defendant signed it. Defendant told the officers that he understood his rights, and signed the form. The officers then reiterated that Defendant could stop the interview at any time by requesting to speak with an attorney.

10

Under these facts, it is clear that Defendant knowingly and voluntarily re-initiated his interview with Agent Johnson and Detective Sperrel after the officers ceased questioning following Defendant's request for counsel. Accordingly, under settled legal principles, the police did not violate Defendant's Fifth Amendment rights by continuing to question him. *See, e.g.*, *Edwards*, 451 U.S. at 484–85; *Henness v. Bagley*, 644 F.3d 308, 320 (6th Cir. 2011) ("An *Edwards* reinitiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk about his case."); *Davie v. Mitchell*, 547 F.3d 297, 305 (6th Cir. 2008) (same); *United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994) (same). We therefore affirm the denial of Defendant's second motion to suppress.

## II. Challenges to Brandishing Charges

### A. Sufficiency of the Evidence

#### 1. Standard of Review

"We review sufficiency of the evidence de novo, affirming the defendant's convictions if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016) (quoting *United States v. Cunningham*, 679 F.3d 355, 369 (6th Cir. 2012)).

#### 2. Governing Law

In *Jackson v. Virginia*, the Supreme Court held that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." 443 U.S. 307, 318 (1979) (footnote omitted). This "inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* at 318–19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). "Instead, the relevant question is whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

In this case, Defendant challenges the sufficiency of the evidence as to his three convictions for violating 18 U.S.C. § 924(c)(1)(A)(ii), which provides:

> **(c)(1)(A)** . . . any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . .
>
> . . .
>
> > **(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years[.]

At trial, the government argued that Benson brandished a firearm during his robberies on May 29, 2014, July 29, 2014, and January 8, 2015, and that Defendant aided and abetted those crimes. We have held a "defendant may be found to have brandished a firearm under an aiding and abetting theory of liability." *United States v. Franklin*, 415 F.3d 537, 554 (6th Cir. 2005); *United States v. Robinson*, 389 F.3d 582, 590–91 (6th Cir. 2004). To sustain a conviction under § 924(c) for aiding and abetting:

> The government must prove that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime. The government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him. This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime.

*Franklin*, 415 F.3d at 554 (quoting *Rattigan v. United States*, 151 F.3d 551, 558 (6th Cir. 1998)). In addition, the Supreme Court has recently held that a defendant "has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." *Rosemond v. United States*, 134 S. Ct. 1240, 1249 (2014).

### 3. Analysis

Defendant argues that the evidence introduced at trial was insufficient to prove that he had "advance knowledge"—as required by *Rosemond*—that Benson would *brandish* a gun during the three successful robberies committed by the brothers. *See Rosemond*, 134 S. Ct. at 1251. Rather, he argues that the evidence at trial showed only that he knew that Benson would *use* a gun during the robberies. He does not argue that the government failed to satisfy its burden to prove the other elements of a § 924(c)(1)(A)(ii) offense with respect all three of the robberies.[3]

Defendant's argument misreads *Rosemond* and misstates the law. In *Rosemond*, the Supreme Court explained the *mens rea* necessary to satisfy § 924(c)'s intent requirement as follows:

> . . . An active participant in a [crime of violence] has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one. In so doing, he has chosen . . . to align himself with the illegal scheme in its entirety—including its use of a firearm. And he has determined . . . to do what he can to "make [that scheme] succeed." [*Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)]. He thus becomes responsible, in the typical way of aiders and abettors, for the conduct of others. *He may not have brought the gun to the [crime] himself, but because he took part in that deal knowing a confederate would do so, he intended the commission of a § 924(c) offense—i.e., an armed [crime].*

*Id.* at 1249 (emphasis added).

As this reasoning makes clear, the government was not required to prove that Defendant had advance knowledge that Benson would *brandish* a gun as opposed to use it in some other way. Rather, as long as the government proved that Defendant "decided to join in the criminal venture . . . with full awareness of its scope . . . including its use of a firearm," Defendant is liable as an aider and abettor under § 924(c) regardless of whether Benson ultimately brandished the gun, or made some other use of it. *Id.* Because the evidence here shows that Defendant

---

[3] For example, he concedes that Benson brandished a gun during the robberies.

knew that Benson would use a gun in the course of the brothers' robberies—indeed, the evidence shows that Defendant planned the robberies—and still agreed to act as the getaway driver, the evidence was sufficient to sustain Defendant's § 924(c)(1)(A)(ii) convictions. *See id.* (collecting cases for the proposition that an "unarmed driver of a getaway car ha[s] the requisite intent to aid and abet armed bank robbery if he 'knew' that his confederates would use weapons in carrying out the crime"); *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (rejecting sufficiency of the evidence challenge to conviction for aiding and abetting § 924(c) offense where defendant knew that his co-conspirator "was armed to further the underlying . . . offense"); *Franklin*, 415 F.3d at 555 (same).

## B. Jury Instructions

### 1. Standard of Review

Defendant did not challenge the jury instructions issued as to his § 924(c) charges before the district court. Our review is therefore for plain error. Fed. R. Crim. P. 52(b). We have explained that:

> [P]lain error review "involves four steps." *Puckett v. United States*, 556 U.S. 129, 135 (2009). "First, there must be an error or defect—some sort of '[d]eviation from a legal rule'—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant." *Id.* (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 732–33 (1993)). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.* "Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 734). "Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (alteration in original) (quoting *Olano*, 507 U.S. at 736).

*Atkins*, 843 F.3d at 632–33.

### 2. Analysis

At trial, the district court instructed the jury that that the government was required to prove the following elements beyond a reasonable doubt in order to carry its burden on the

§ 924(c) charges: (i) "that [Benson] committed the corresponding crime of violence" for each of the three brandishing charges—in other words, the May 29, 2014, July 29, 2014, and January 8, 2015 bank robberies; (ii) "that [Benson] knowingly brandished a firearm;" (iii) "that the brandishing of the firearm was during and in relation to the corresponding crimes charged in Counts Two, Four, and Six [the successful bank robberies];" (iv) "that [Defendant] helped to commit or encouraged someone else to commit the crime of brandishing a firearm during and in relation to a crime of violence;" and (v) "that [Defendant] intended to help commit or encourage the crime of brandishing a firearm during and in relation to a crime of violence" by having "advanced knowledge that [Benson] would brandish a firearm during the commission of a crime of violence." (R. 145-7, Trial Tr. Vol. VIII, PageID #2306–09.) The district court separately instructed the jury as to the elements of armed bank robbery.

Citing our recent decision in *United States v. Henry*, 797 F.3d 371 (6th Cir. 2015), Defendant argues that these jury instructions were plainly erroneous because "there was no instruction that the intent [element] must go to the brandishing of a firearm during and in relation to armed bank robbery[.]" (App. R. 40, Appellant's Br., at 30.) Put differently, Defendant appears to argue that by using the words "crime of violence" instead of "armed bank robbery" in the instructions, the district court permitted the jury to find Defendant guilty without finding that Defendant intended to aid and abet an armed bank robbery.

As the government rightly points out, this argument is nonsensical. As we explained in rejecting Defendant's sufficiency of the evidence challenge, all that the government was required to prove in order to carry its burden on the § 924(c) charges was that Defendant intentionally aided and abetted three armed bank robberies with advance knowledge that the robber (Benson) would be carrying a gun. The instructions in this case thoroughly and accurately explained those requirements to the jury, and we can discern no error, plain or otherwise.

Moreover, even if the instructions had been erroneous, any such error would not have affected Defendant's substantial rights. The jury was separately and accurately instructed as to

the elements necessary to find that Defendant aided and abetted the three bank robberies (Counts 2, 4, and 6.) The jury convicted as to each of those counts. Thus, the jury necessarily found that Defendant intended to aid and abet the robberies, which, combined with Defendant's advance knowledge that Benson would be armed, was sufficient for the jury to convict on the § 924(c) charges.

Finally, we note that *Henry* provides no support for Defendant's argument. In that case, the defendant was charged with aiding and abetting the possession of a firearm by his accomplice during a bank robbery. *Henry*, 797 F.3d at 374. However, the jury was not instructed that it was required to find that the defendant had advance knowledge that his accomplice would be armed during the charged bank robbery in order to sustain the § 924(c) conviction. *Id.* at 375. We thus found plain error because the jury instructions squarely violated *Rosemond*. *Id.* In this case, by contrast, the jury was explicitly instructed that it was required to find that Defendant had advance knowledge that Benson would be using a gun during the robberies. We therefore reject Defendant's challenge to the jury instructions.

## IV. Challenges to Defendant's Sentence

### A. Reasonableness Challenges

#### 1. Standard of Review

Challenges to the reasonableness of a district court's sentence are reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. Fowler*, 819 F.3d 298, 303 (6th Cir. 2016) (quoting *United States v. Bridgewater*, 606 F.3d 258, 260 (6th Cir. 2010)).

Challenges to a sentence's procedural reasonableness, however, are "limited to plain error review if the trial court invited the defendant's objections to the sentence pursuant to *United States v. Bostic*, 371 F.3d 865, 871-72 (6th Cir. 2004), and the defendant failed to raise

the issue at that time." *United States v. Massey*, 663 F.3d 852, 856 (6th Cir. 2011); *see also United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

### 2.      Procedural Reasonableness

Our review of a sentence's procedural reasonableness proceeds through three steps:

First, we must ensure that the district court "correctly calculat[ed] the applicable Guidelines range" which are "the starting point and initial benchmark" of its sentencing analysis. [*Gall*, 552 U.S. at 51.] In reviewing the district court's calculation of the Guidelines, we still review the district court's factual findings for clear error and its legal conclusions *de novo.* [*United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007).]

However, the advisory Guidelines range is only one of several factors that the district court must consider at sentencing. *See* 18 U.S.C. § 3553(a). Thus, our second task is to ensure that the district judge gave "both parties the opportunity to argue for whatever sentence they deem appropriate" and then "considered all of the § 3553(a) factors to determine whether they support the sentence requested by [each] party." [*Gall*, 552 U.S. at 50]. In evaluating the parties' arguments, the sentencing judge "may not presume that the Guidelines range is reasonable." *Id.*; *accord* [*Rita v. United States*, 551 U.S. 338, 351 (2007)]. Rather, the district judge "must make an individualized assessment based on the facts presented" and upon a thorough consideration of all of the § 3553(a) factors. [*Gall*, 552 U.S. at 50.]

After the district court's evaluation of the parties' arguments in light of the § 3553(a) sentencing factors, the district judge will impose a sentence and must explain his reasons for selecting the sentence imposed. Accordingly, our final task is to ensure that the district court has "adequately explain[ed] the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* Reversible procedural error occurs if the sentencing judge fails to "set forth enough [of a statement of reasons] to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." [*Rita*, 551 U.S. at 356].

*United States v. Bolds*, 511 F.3d 568, 579–80 (6th Cir. 2007) (footnotes omitted).

Defendant argues that his sentence was procedurally unreasonable under a variety of theories. We will address each in turn.

### i.     Alleged Improper Speculation

First, Defendant argues that the district judge procedurally erred by basing his sentence off of improper speculation about future changes Congress might make to the current sentencing regime.  In order to understand the import of Defendant's argument, it is necessary to briefly recount how the district court calculated Defendant's sentence.

As recited earlier, Defendant was convicted of one count of conspiracy to commit bank robbery, two counts of aiding and abetting a bank robbery with forced accompaniment, one count of aiding and abetting an armed bank robbery, and three counts of aiding and abetting the brandishing of a firearm during an armed bank robbery.  For the four non-brandishing counts, the district court calculated Defendant's total offense level at 34, and classified him as a category III offender, yielding a Guidelines range of 188–235 months' imprisonment that could not be lowered below 120 months because the forced accompaniment charges triggered a ten-year mandatory minimum sentence.  *See* 18 U.S.C. § 2113(e) ("Whoever, in committing any offense defined in this section . . . forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years.").  Additionally, for the brandishing counts, federal law imposes a mandatory minimum sentence of seven years for the first count, and twenty-five years for each successive count, all to be served consecutively with each other and any other sentence the defendant may receive.  *See* 18 U.S.C. § 924(c)(1)(A)(ii) ("[I]f the firearm is brandished, [the defendant] shall be sentenced to a term of imprisonment of not less than 7 years."); *id.* § 924(c)(1)(C)(i) ("In the case of a second or subsequent conviction under this subsection, the person shall . . . be sentenced to a term of imprisonment of not less than 25 years."); *id.* § 924(c)(1)(D)(ii) ("[N]o term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person.").  The district court sentenced Defendant to the bottom of the Guidelines range for the non-brandishing counts (188 months), plus the required fifty-seven years for the brandishing counts, to reach a total of 872 months' imprisonment.

Understandably, given the lengthy mandatory minimums he was facing, Defendant asked the district court to use its limited discretion to give him a below-Guidelines sentence on the four non-brandishing counts. Defendant argued that a sentence significantly below 188 months (but presumably above the 120 month mandatory minimum) would be sufficient, but not greater than necessary, to punish his conduct.

In rejecting Defendant's request, the district court recounted the seriousness of Defendant's crimes, the psychological scars that Defendant's crimes would leave on the tellers and customers that were present during the robberies, and Defendant's failure to take responsibility for his actions despite overwhelming evidence of his guilt. The district court also acknowledged that due to the mandatory minimum sentences required by § 924(c), it had relatively little discretion to give Defendant a more lenient sentence even if his conduct had warranted leniency. The district court further stated that:

> Regarding the 188 months is where I do have some discretion. And I am fearful that if I say, let's just pick a number out, let's say I say 160 months or 120 months then we have a change in statutes. Maybe I shouldn't worry about the future, and I don't think it makes a lot of difference actually.

(R. 136, Sentencing Tr., PageID #742.)

Defendant argues that this passage shows that the district court refused to grant his downward departure because it worried that Congress might one day eliminate the mandatory enhancements for § 924(c) offenses, and thereby leave Defendant with too light a sentence. Defendant concludes that his sentence was thus infected by improper speculation.

We disagree. When that passage is read in context of the entire sentencing transcript, it is clear that the district court denied a downward departure because it felt that a lower sentence would not reflect the seriousness of Defendant's offenses. The district court focused on the tremendous risk the robberies posed to innocent bystanders, the brazenness of the crimes, and Defendant's general refusal to take any responsibility for his conduct. The district court felt that granting a departure would signal that Defendant's crimes were less serious than they actually

were, and concluded that Defendant's sentence—even with the high mandatory minimums—was sufficient, but not greater than necessary, punishment. We can discern no abuse of discretion in the district court's decision.

The two cases Defendant cites in support of his argument are not on point. In *United States v. Recla*, 560 F.3d 539, 545–46 (6th Cir. 2009), we held that a district court cannot give a defendant a greater sentence on the understanding that the sentence may later be reduced by a Rule 35(b) motion filed by the government. The district court here did not inflate Defendant's sentence in anticipation of Congress eventually eliminating the mandatory minimums in § 924(c), but rather found that a below-Guidelines sentence would not reflect the seriousness of Defendant's offenses. And further, *Dean v. United States*, 137 S. Ct. 1170, 1176–77 (2017), merely held that nothing "in § 924(c) restricts the authority conferred on sentencing courts by § 3553(a) and the related provisions to consider a sentence imposed under § 924(c) when calculating a just sentence for the predicate count." The Supreme Court did not hold that district courts are *required* to factor in § 924(c) mandatory minimums when calculating an appropriate sentence for the predicate offenses.

Accordingly, we hold that Defendant's sentence was not tainted by improper speculation.

### ii.      Alleged Sentencing Disparity Error

At his sentencing hearing, Defendant also argued that he should receive a below-Guidelines sentence to avoid creating a wide disparity between his sentence (more than seventy years) and Benson's sentence (seventeen years following a guilty plea). *See* 18 U.S.C. 3553(a)(6). In rejecting this argument, the district court stated:

> Regarding sentence disparities, that was raised by Mr. Mitchell. Disparity you look at on a national basis, not an individual basis for a particular case. And if people follow the statute, there would be very little disparity for the same crimes.

(R. 136, PageID #741.) Defendant argues that a district court may consider individual sentence disparities between co-defendants in addition to the need to avoid creating disparities between

20

similarly situated defendants nationwide, and that therefore the district court procedurally erred by failing to consider the disparity between Defendant's and Benson's sentences.

Defendant is incorrect. As an initial matter, the district court was correct that 18 U.S.C. § 3553(a)(6) "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar conduct." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007) (collecting cases). "It is not concerned with disparities between one individual's sentence and another individual's sentence, despite the fact that the two are co-defendants." *Id.* While a district judge "*may* exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence . . . the district court is not *required* to consider that type of disparity under § 3553(a)(6)." *Id.* at 624. In other words, the district court correctly stated the law, and its decision not to grant Defendant a downward variance in light of Benson's sentence was well within its discretion. Moreover, given that the district court heard extensive testimony that Defendant was the "mastermind" behind the burglaries, it was not unreasonable for the district court to conclude that Defendant's conduct was more culpable than Benson's. We therefore find no abuse of discretion on this argument as well.

### iii.    Failure to Group Counts Pursuant to U.S.S.G. § 3D1.2

Defendant next argues that the district court committed two related errors in calculating Defendant's Guidelines range. Because both of these alleged errors relate to how Defendant's robbery and conspiracy convictions were grouped in calculating his total offense level, we will briefly describe the grouping calculation that the district court performed.

Under the Guidelines, when "a defendant has been convicted of more than one count," the court must: (i) place each offense into a "group," whereby closely related counts are grouped together for sentencing purposes; (ii) then determine the offense level applicable to each group "by applying the rules specified in [USSG] § 3D1.3;" and finally (iii) determine the "combined offense level" for all of the groups taken together "by applying the rules specified in [USSG] § 3D1.4." USSG § 3D1.1(a)(1)–(3). In performing the "grouping" at step one, the Guidelines

specify that a "conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." USSG § 1B1.2(d). Offenses may then be grouped if: (i) the "counts involve the same victim and the same act or transaction;" (ii) the "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan;" (iii) when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts;" or (iv) when "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." USSG § 3D1.2(a)–(d).

In this case, Defendant was charged with aiding and abetting the May 29, 2014, July 29, 2014, and January 8, 2015 robberies, and conspiring to commit both those robberies and the three aborted robberies on October 7, 2014, February 18, 2015, and February 27, 2015. Pursuant to § 1B1.2(d), the conspiracy count divided into six constituent conspiracies—as if the jury had convicted Defendant of separate counts of conspiring to commit each successful and aborted robbery. Section 3D1.2(a) then called on the district court to group each constituent conspiracy to commit a successful robbery with the corresponding charge of aiding and abetting—because they "involve[d] the same victim and the same act or transgression." This left six offense groups: the pairings for each successful robbery and the constituent conspiracies for each aborted robbery.[4] The district court then calculated the aggregate offense level based on these groupings.

---

[4] Curiously, the presentence investigation report ("PSR") prepared by the probation department effectively found that there were seven offenses to group: in addition to the May 29, 2014, July 29, 2014, and January 8, 2015 robberies, and the aborted robberies on October 7, 2014, February 18, 2015, and February 27, 2015, the PSR also treated Count 1 of the indictment (conspiracy to commit bank robbery) as a separate offense to be grouped. This was erroneous; under § 1B1.2(d), the district court was required to separate Count 1 into its constituent

Defendant argues that the above-referenced grouping procedure was improper for two reasons.[5]  First, Defendant argues that the three unconsummated robberies—which were listed as overt acts in furtherance of Defendant's conspiracy to commit bank robbery in Count 1 of the indictment—should not have been grouped separately, because the verdict form submitted to the jury did not require a special finding that each of the charged overt acts actually occurred.  In other words, Defendant argues that he cannot be sentenced on the aborted robberies because the jury was not asked to find that he individually participated in each unsuccessful robbery attempt.

However, the logic of our precedents refutes this argument.  In *United States v. Ford*, we held that "robberies may be counted as object offenses of a conspiracy" for Guidelines grouping purposes even "when the conspiracy count under which [the] defendant was convicted does not enumerate or list the robberies."  761 F.3d 641, 659–60 (6th Cir. 2014).  We reasoned that because Application Note 4 in § 1B1.2 "specifically addresses situations where 'the verdict . . . does not establish which offense(s) was the object of the conspiracy,' if the [Guidelines] 'required that the object of a conspiracy be specifically named in the conspiracy count of an indictment, it would be difficult to imagine the reason for this comment's existence.'"  *Id.* at 660 (quoting *United States v. Robles*, 562 F.3d 451, 455 (2d Cir. 2009)); *see also* USSG § 1B1.2 note 4 ("Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy.  In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.").  The same reasoning is equally applicable here.

conspiracies, and leave Count 1 itself out of the grouping analysis.  However, the district court ultimately accepted the PSR's recommendation to group Count 1 with Count 2 (the May 29, 2014 robbery), leaving the district court with six groups corresponding to the three successful and three aborted robberies.  This was the correct grouping arrangement required by the Guidelines.  Since neither party has raised the error, and the district court arrived at the correct groups anyway, we will not discuss the matter further.

[5] Because Defendant made neither of these arguments before the district court, we review them for plain error.  *Vonner*, 516 F.3d at 386.

Application Note 4 specifically envisions the scenario at issue in this case, where the district court is asked to sentence a defendant in part based on objects of a conspiracy that were not specifically found by a jury, and instructs district courts to include the alleged offense only if the district judge is convinced that the offense occurred. The clear implication of this note is that the lack of a special jury verdict finding that each of the objects of the conspiracy actually occurred does not prevent a defendant from being sentenced based on those objects.

Defendant's second argument is that the three successful robberies should have been grouped together for sentencing purposes. However, those three robberies were not groupable under any of the four criteria listed in § 3D1.2, and Defendant has put forward no argument to the contrary. We therefore hold that the district court did not err in grouping the successful robberies separately.

### iv.  Alleged Improper Stacking

Defendant also argues that he should not have received fifty years' worth of mandatory sentencing enhancements under 18 U.S.C. § 924(c)(1)(C)(i), because his second and third brandishing convictions were not "second or subsequent" convictions within the meaning of that statute. Defendant acknowledges that the Supreme Court rejected this precise argument in *Deal v. United States*, 508 U.S. 129, 130–137 (1993), but raises the argument in order to preserve it for a petition for certiorari. Certainly, the Supreme Court's interpretation of § 924(c)(1)(C)(i) routinely produces strikingly long prison sentences, and there are perhaps good reasons to believe that Congress did not intend this result. *See Deal*, 508 U.S. at 138 (Stevens, J., dissenting). Nevertheless, we are bound to follow *Deal* unless and until the Supreme Court overrules it. We therefore reject this argument as well.

### B. Eighth Amendment Challenge

#### 1. Standard of Review

"We review *de novo* a constitutional challenge to a district court's sentence." *United States v. Young*, 847 F.3d 328, 362 (6th Cir. 2017); *United States v. Kelsor*, 665 F.3d 684, 701 (6th Cir. 2011); *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009).

#### 2. Analysis

Finally, Defendant argues that his long sentence (872 months) violates the Eighth Amendment's bar against cruel and unusual punishment. Specifically, Defendant argues that the application of § 924(c)'s mandatory minimums violated his right to an individualized sentencing determination, because most of his sentence was imposed by statute rather than the discretion of the district court.

As an initial matter, we note that the right to an individualized sentencing determination is a statutory right conferred by 18 U.S.C. § 3553, and not a constitutional right located in the Eighth Amendment. As we explained in rejecting Defendant's challenges to the procedural reasonableness of his sentence, the district court did not abuse its discretion in calculating or imposing the sentence it levied.

Defendant has not attempted to cite or argue actual Eighth Amendment principles in support of his constitutional challenge. As the government points out, however, to the extent Defendant's Eighth Amendment argument has not been waived, it is foreclosed by our precedent. We have repeatedly upheld sentences as long or longer against Eighth Amendment challenges under similar factual circumstances. *United States v. Beverly*, 369 F.3d 516, 536 (6th Cir. 2004) (upholding sentence of 71 1/2 years for a cooperating defendant with no criminal record who drove a getaway car in four bank robberies and provided false identification); *United States v. Marks*, 209 F.3d 577 (6th Cir. 2000) (upholding a sentence of 2242 months where the defendant was involved in nine bank robberies, and a sentence of 1395 months for involvement

in six armed robberies); *United States v. Ervin*, 266 F. App'x 428, 437–38 (6th Cir. 2008) (collecting cases); *United States v. Willis*, 232 F. App'x 527 (6th Cir. 2007) (holding that the defendant's sentence of 1920 months or 160 years, for eight counts of armed robbery and eight counts under § 924(c) was not unconstitutional); *United States v. Savoca*, 166 F. App'x 183 (6th Cir. 2006) (per curiam) (holding that 927 months' imprisonment for four bank robberies and two counts of § 924(c) was not unconstitutional); *United States v. Wiley*, 132 F. App'x 635 (6th Cir. 2005) (holding that 3184 month sentence (over 265 years) imposed for eleven counts of armed robbery and eleven counts of § 924(c) which occurred in less than six weeks was not unconstitutional); *United States v. Legette-Bey*, 147 F. App'x 474 (6th Cir. 2005) (holding that 154 years' imprisonment for six bank robberies and several related firearms charges was not cruel and unusual under the Eighth Amendment). We therefore uphold Defendant's sentence as well.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.