**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0457n.06

**No. 17-5721**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 04, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| TERENCE DICKENS, | |
| Defendant-Appellant. | |

**BEFORE:** SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Terence Dickens appeals from the judgment of conviction and sentence entered by the district court for conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349; and six counts of aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 1028A, 2. For the reasons that follow, we **AFFIRM** Defendant's convictions and sentence.

**BACKGROUND**

Defendant engaged in a check fraud conspiracy in which he stole checks out of mailboxes, altered the checks, and hired other people to cash the altered checks. One of Defendant's "check cashers" was Shellie Grubbs, who worked for Defendant so she could afford to pay for bills and drugs. Defendant normally gave Grubbs about $200 to cash large checks, or he paid her in drugs.

Another one of Defendant's "check cashers" was Vickie Lamb, who typically received a ten-percent commission on the checks she cashed.

A third recruit was Thomas Jones, whom Defendant met through one of Jones' relatives. Defendant told Jones that he had a business proposal that involved cashing checks. The two men met at a grocery store, and Defendant gave Jones a $73,900 check that was payable to Jones. Jones deposited the check into a new bank account and withdrew $10,000 in cash, but the bank would not give him the rest of the money immediately. Jones returned to the car and gave Defendant the $10,000. Defendant then pulled out a gun and forced Jones and his fiancée to sit in a hotel room with him until the money cleared and the bank opened. While they were in the hotel, Defendant explained to Jones that he and his nephew stole checks from mailboxes, removed the original payees' names, and replaced them with other names. Defendant told Jones that he recruited people who used heroin to work as check cashers. Jones was arrested when he went to withdraw more of the $73,900 deposit. Defendant got away, however, because he had remained in the car while Jones went inside to make the withdrawal.

The check cashers knew Defendant by several aliases. Jones knew him as Juju, Grubbs knew him as K.T. (short for Kevin Thomas), and Lamb knew him by both Juju and K.T. Detectives identified Defendant after Grubbs was arrested for cashing an altered check and agreed to cooperate. Grubbs identified several coconspirators: a man named "K.T.," or "Kevin T.," K.T.'s nephew, and Vickie Lamb. She showed detectives a check that she had recently deposited via mobile deposit for Defendant and that had not yet cleared. She agreed to set up a meeting with Defendant so that the detectives could identify him.

The officers listened as Grubbs called Defendant on speakerphone to set up a meeting. The officers then accompanied Grubbs to the meeting location and surveilled the meeting point from

afar. As Defendant approached, Grubbs pointed out Defendant's vehicle. One team of officers pulled over the vehicle, and another stayed with Grubbs. Upon pulling over the vehicle, officers found Defendant and his nephew inside, and they detained both men. The detaining officers texted pictures of the two men's driver's licenses to the officers who were with Grubbs. Grubbs confirmed that Defendant was the man she knew as K.T. and that the other man was K.T.'s nephew. Officers then took Defendant into custody.

Three months later, while Defendant was out of jail on bond, Defendant's nephews had an encounter with police that led to a high-speed car chase. The chase ended when the fleeing vehicle crashed into a telephone pole. A few hours before the chase took place, Defendant was seen in the vehicle with his nephews. However, when officers approached the vehicle shortly after the crash, they found only the nephews—and not Defendant—in the vehicle. One of the nephews later told police that a third person had been in the car with them during the chase.

A federal grand jury indicted Defendant on one count of conspiracy to commit bank fraud and six counts of aiding and abetting aggravated identity theft. After a five-day trial, a jury convicted Defendant on all seven counts. At the close of the government's case, Defendant moved for judgment of acquittal, which the Court denied. After conviction, Defendant renewed his motion, and the Court again denied the request. The court sentenced Defendant to a term of 168 months' imprisonment, followed by a five-year term of supervised release. Defendant then filed this timely appeal.

## DISCUSSION

Defendant asks this Court to remand his case for a new trial, alleging errors in two of the district court's evidentiary rulings and in the jury instructions. Defendant also asks this Court to

reverse a sentencing enhancement based on another allegation of error. We address each issue in turn.

A.

Invoking the fruit of the poisonous tree doctrine, *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), Defendant first argues that the district court should have granted his motion to suppress all evidence recovered from the scene of Defendant's arrest. In reviewing a motion to suppress in this context, we review conclusions of law *de novo*, *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009), and we view the evidence in the light most favorable to the government, *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2006).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "A warrantless search or seizure is '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters, which may be initiated by a police officer based on a mere hunch or without any articulable reason whatsoever; (2) investigative stops (or *Terry* stops), which are temporary, involuntary detentions and which must be predicated upon "reasonable suspicion;" and (3) arrests, which must be based upon "probable cause." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (citing *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004)).

In this case, Defendant argues that the officers' actions violated his Fourth Amendment rights in three independent ways: (1) the officers performed an unreasonable arrest, (2) the officers

- 4 -

unlawfully initiated a *Terry* stop, and (3) the *Terry* stop was unreasonable in scope. We address each argument in turn.

1.    The Arrest

A police officer may conduct a warrantless arrest of an individual when the officer has probable cause to believe that the individual has committed a felony or misdemeanor in the officer's presence or a felony away from the officer's presence. *United States v. Watson*, 423 U.S. 411, 417–18 (1976). "[T]he Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though he had adequate opportunity to procure a warrant after developing probable cause for arrest." *Id.* at 427. Therefore, the inquiry is "not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest." *Id.* at 417.

Probable cause means "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). It requires a "fair probability," *Illinois v. Gates*, 462 U.S. 213, 238 (1983), a term that the Supreme Court has never defined but has instead described as a "commonsense, practical question" to be judged from the totality of the circumstances. *Id.* at 230. "In determining whether probable cause exists, we may not look to events that occurred after the [arrest] or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the [arrest]." *Smith v. Thornburg*, 136 F.3d 1070, 1074–75 (6th Cir. 1998) (citing *United States v. Ferguson*, 8 F.3d 385, 391–92 (6th Cir. 1993) (en banc)). "[T]he corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect. The more unusual the occurrences are that the police are able to confirm,

the stronger the showing of probable cause, and vice versa." *United States v. Strickland*, 144 F.3d 412, 417 (6th Cir. 1998).

In *Strickland*, this Court found that officers had probable cause to conduct a warrantless arrest of DeWayne Strickland, a suspected drug dealer, based on their corroboration of information provided by an informant. *See Strickland*, 144 F.3d at 417. The informant explained to detectives that he had previously purchased cocaine from Strickland, and he described how the transactions typically took place: Strickland would meet the informant inside the informant's vehicle at a predetermined location, chat for a few moments, and then exchange money for drugs. *Id.* at 414. The detectives then listened as the informant called Strickland to arrange a meeting to purchase an ounce of cocaine. *Id.* at 414. The informant and a group of detectives drove to the agreed-upon location at the agreed-upon time. *Id.* From afar, the detectives watched as Strickland arrived, got out of his vehicle, got into the informant's vehicle, and, after a few minutes, returned to his own vehicle. *Id.* Based on these corroborating observations, the detectives then converged on Strickland, arrested him, and searched his vehicle. *Id.* This Court upheld the search and arrest as supported by probable cause. *Id.* at 417.

In *Barrett*, an informant arranged to purchase an ounce of cocaine from Jeffrey Dolan, a suspected drug dealer. *United States v. Barrett*, 890 F.2d 855, 857 (6th Cir. 1989). When the informant called Dolan to arrange the purchase, Dolan told the informant that he would have the cocaine available later that day. *Id.* at 857–58. Officers obtained a search warrant for Dolan's residence based on this call, which they recorded. *Id.* At the residence, officers found evidence of other crimes, but no cocaine. *Id.* While the agents were inside Dolan's residence, however, a third person, Virgile Barrett, arrived. *Id.* A plainclothes officer suspected that Barrett may have been Dolan's supplier and approached him. *Id.* Barrett, not realizing that the plainclothes officer

was conducting a drug enforcement investigation, asked about Dolan. *Id.* The officer identified himself as a law enforcement officer and told Barrett that Dolan was under arrest inside the residence. *Id.* Barrett had "an abrupt change in behavior," becoming "quite noticeably nervous." *Id.* This behavior increased the officer's suspicion that Barrett was Dolan's supplier. *Id.* The officer arrested Barrett, searched his car, and found an ounce of cocaine. *Id.* at 858. This Court found that the arrest and the search were supported by probable cause. *Id.* at 861.

Like the officers in *Strickland* and *Barrett*, the officers in this case had probable cause to arrest a suspect based on their corroboration of information provided by an informant. Shellie Grubbs told officers that she worked for Defendant, who supplied her with modified checks to deposit. Grubbs showed Officer McKinney one of the allegedly altered checks; she said that she had recently deposited the check via mobile deposit and that Defendant was waiting for it to clear so that he could send Grubbs to withdraw the funds. Police listened as Grubbs called Defendant on speakerphone to arrange a meeting to discuss the status of the deposit. During the call, Defendant made several statements that corroborated Grubbs' story about the fraudulent check as well as Defendant's role as the leader of the conspiracy. Grubbs then told the officers where the meeting would take place, described the car that Defendant would be driving, and told police the precise spot and direction in which Defendant would park. On the way to the meeting, Grubbs called Defendant, and he told her that he had "something" for her. (R. 188 at PageID #614.) Grubbs told the officers that she thought he was referring to another forged check, raising their suspicion that Defendant was in possession of contraband. Defendant then arrived in the car that Grubbs predicted he would be driving, traveling toward the spot where she predicted he would park. Grubbs pointed at Defendant's vehicle to identify him.

In these circumstances, there was at least a fair probability that Defendant had committed felony bank fraud and that he was attempting to join Grubbs for a meeting in furtherance of a conspiracy to commit bank fraud. Grubbs was credible because officers knew her identity and because she had made statements against her own penal interests by admitting that there was a bank fraud scheme that extended beyond the one incident for which she had been arrested. *United States v. Harris*, 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause[.]"). Grubbs also predicted Defendant's actions in a way that supported her allegation that Defendant was the organizer of a bank fraud conspiracy. Grubbs showed officers an altered check, told them that Defendant was responsible for altering it, and said that Defendant was waiting for the check to clear. Officers then listened as Grubbs spoke to Defendant, and, consistent with Grubbs' assertions about Defendant's role in the conspiracy, Defendant asked about whether the check had cleared. Before setting up a meeting with Defendant, Grubbs described Defendant's vehicle and predicted Defendant's movements, further demonstrating her familiarity with Defendant's affairs. Grubbs' predictions, which were supported by tangible evidence in the form of the check and which were partially corroborated by police, supported probable cause "because [when] an informant is shown to be right about some things, [s]he is probably right about other facts that [s]he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Alabama v. White*, 496 U.S. 325, 331 (1990). Accordingly, by the time they stopped Defendant's vehicle, the officers had probable cause to believe that Defendant had committed a felony and that they would find Defendant in the vehicle. Grubbs then confirmed that Defendant was the man she knew as K.T. Thus, the arrest did not violate Defendant's Fourth Amendment rights. *See Watson*, 423 U.S. at 417–18.

Defendant argues that the officers were not entitled to rely on the information from Grubbs because when "faced with an informant who begins incriminating others and who has no proven track record of reliability, courts require other evidence demonstrating indicia of reliability." (Reply at 6.) In support of this "other evidence" requirement, Defendant cites *Draine v. Bauman*, 708 F. Supp. 2d 693, 700 (N.D. Ill. 2010). This case is not binding authority, nor are we persuaded that the officers required more evidence of Grubbs' reliability in this case; Grubbs provided tangible evidence in the form of an altered check, she made statements against her penal interests, and she allowed officers to listen to a telephone call in which Defendant made statements that were consistent with Grubbs' allegations against him.

Defendant also complains that the officers were unable to corroborate the informant's prediction that the "something" Defendant had for her was another altered check. (Reply at 7.) But the fact that officers ultimately "found no checks or suspicious packages in the vehicle" (*id.*) does not retroactively strip the officers of probable cause; the correct inquiry focuses on the officers' basis for probable cause prior to a search or arrest. *Smith*, 136 F.3d at 1074–75. As in *Strickland* and *Barrett*, the officers' suspicion in this case was based on information from an informant and rose to the level of probable cause. *See Strickland*, 144 F.3d at 417; *Barrett*, 890 F.2d at 861.

Defendant also attempts to pick apart each piece of information that Grubbs provided, suggesting, for instance, that the corroboration of her statement that Defendant would be driving a late-model Chevy Tahoe with Kentucky plates was "insufficient" because "[t]he vehicle itself was not distinctive" and "Kentucky plates are a common sight in lower Ohio." (Reply at 7–8.) Defendant's argument ignores material facts. In addition to describing the vehicle, Grubbs predicted where and when officers could find it. Moreover, Grubbs pointed out the vehicle when

it arrived.  Contrary to Defendant's suggestion, then, the officers did not simply pull over every late-model Chevy Tahoe with Kentucky plates in lower Ohio until they happened to find Defendant.  Each of the informant's statements cannot be considered in isolation; "[t]he totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

2.      The *Terry* Stop

Defendant next asserts that the officers violated his Fourth Amendment rights when they stopped his vehicle prior to the arrest.  The Fourth Amendment permits officers to conduct a *Terry* stop when the officers "have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony" or that a crime is ongoing or imminent.  *United States v. Hensley*, 469 U.S. 221, 228–29 (1985). Reasonable suspicion is:

> more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person . . . based on specific and articulable facts, he may conduct a *Terry* stop.

*Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006)) (citations and internal quotation marks omitted).

For the same reasons that the officers had probable cause to arrest Defendant once they confirmed that he was Grubbs' co-conspirator, the officers had at least reasonable suspicion before stopping the vehicle that one of its occupants had committed a felony and, further, might be in possession of contraband.  Therefore, it was reasonable for the officers to stop the vehicle to investigate their suspicion.  *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (indicating that

"cause to believe any occupant of the vehicle is involved in criminal activity" satisfies "the first *Terry* condition . . . to detain an automobile and its occupants"); *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.").

Even so, Defendant argues that the stop was unreasonable because the officers who conducted the criminal investigation failed to communicate the details of their suspicion to Officer Thompson, who initiated the stop at their request. This argument has no merit. "Under the 'collective knowledge doctrine,' we take into account all of the information available to the law enforcement personnel investigating Defendant in determining the legality of the stop, without myopically focusing on the information available to the trooper that initiated the stop." *United States v. Johnson*, 702 F. App'x 349, 356 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1591 (2018) (citing *Arvizu*, 534 U.S. at 273, and *United States v. Lyons*, 687 F.3d 754, 767–68 (6th Cir. 2012)).

Defendant cites *United States v. Lyons*, 687 F.3d 754 (6th Cir. 2012), in an attempt to evade this simple application of the collective knowledge doctrine. In *Lyons*, this Court explained that "an officer who acts *independently* of another" officer who has reasonable suspicion "and who acts in ignorance of any information that would establish reasonable suspicion, is not entitled to claim collective knowledge after the fact." *Lyons*, 687 F.3d at 768 (emphasis added). But Officer Thompson did not act "independently" in this case; rather, the investigating officers asked him to stop Defendant's vehicle in connection with their investigation. Defendant's argument is therefore unavailing.

3.      The Scope of the *Terry* Stop

Finally, Defendant argues that the officers exceeded the lawful scope of a *Terry* stop when they photographed his driver's license and texted the photograph to another officer, who then showed the photograph to the informant for purposes of confirming Defendant's identity.  (Def. Br. 20.)  Defendant suggests two possible reasons that this conduct was unreasonable under the Fourth Amendment.  We are not persuaded by either argument.

*First*, Defendant argues that it was unreasonable for the officers to extend the duration of his detention by conducting the identification procedure with his driver's license.  But the lawful duration of a *Terry* stop depends on the purpose of the stop, *see Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 188 (2004) (citing *Terry*, 392 U.S. at 20), and the detaining officer is generally permitted "to try to obtain information confirming or dispelling the officer's suspicions," *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  To that end, "an officer may ask a suspect to identify himself during a *Terry* stop," *Hiibel*, 542 U.S. at 186, and state law may "require a suspect to disclose his name in the course of a *Terry* stop," *id.* at 187.  Moreover, in *Hayes*, the Supreme Court suggested that reasonable suspicion would permit "a narrowly circumscribed procedure for fingerprinting," as long as there is "a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch."  *Hayes v. Florida*, 470 U.S. 811, 815, 817 (1985).  By sending a text message containing a photograph of Defendant's driver's license to investigators who were standing by with their informant, the officers in this case worked quickly—indeed,

nearly instantaneously—to "establish or negate the suspect's connection with" the bank fraud. *See id.* As such, the procedure did not unreasonably extend the duration of the *Terry* stop.[1]

*Second*, Defendant argues that the officers violated his Fourth Amendment rights when they took a photograph of his driver's license and shared that photograph with a citizen informant. (Def. Br. 21.) We are not persuaded. Defendant fails to identify which portion of this identification procedure implicates a Fourth Amendment interest. And although Defendant cites two cases in support of his argument, we find that neither case is relevant. Defendant first cites *Carter v. City of Yonkers*, 345 F. App'x 605 (2d Cir. 2009), for the proposition that "unconsented photography falls outside the scope of investigative measures permitted under a *Terry* stop." (Def. Br. 31.) In *Carter*, the court affirmed a jury verdict in a § 1983 case where law enforcement had stopped and searched the plaintiffs' cars and cell phones and had taken photographs of the plaintiffs without consent or probable cause. 345 F. App'x at 606–07. *Carter*, however, does not suggest that unconsented photography during a *Terry* stop in and of itself violates the Fourth Amendment. Rather, the *Carter* court concluded that "[t]he extensive search of [the plaintiffs], their vehicle, and/or their cell phones, along with the photographing—whether alone or in combination—went well beyond what was permissible under a *Terry* stop." *Id.* at 606. Thus, the

---

[1] Citing *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999), the government argues that the identification procedure was reasonable because "in a valid traffic stop, an officer can request a driver's license . . . [and] run a computer check thereon." (Gov. Br. 24.) However, the identification procedure in this case did not take place during a typical traffic stop because the officers' investigation was unrelated to their observation of a traffic infraction. Rather, the basis for the officers' investigation in this case was the officers' belief that Defendant had committed a past felony and that he might be in possession of contraband. The permissible scope of the *Terry* stop in this case therefore differs from the reasonable scope of a typical traffic stop, rendering the government's argument irrelevant. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.").

court looked to the totality of the officers' conduct, not merely the photographing, in determining that the conduct was unreasonable.

Defendant also cites *United States v. Archibald*, No. 2015-0041, 2016 WL 3156939 (D.V.I. June 3, 2016), for the proposition that officers must obtain consent to photograph an individual even after conducting a reasonable arrest. In *Archibald*, officers collected a DNA sample and photograph of a suspect in a rape investigation. *See id.* at \*15–\*17. The question in that case was whether the suspect had provided consent—not whether consent was necessary. *See id.* at \*15–\*17. Indeed, the court in *Archibald* assumed that consent was necessary, *see id.* at \*15 (explaining that the government asserted consent "as the lawful basis for obtaining evidence"), and the court's opinion does not suggest why or under what circumstances unconsented photography might violate the Fourth Amendment. *Archibald* therefore does not support Defendant's position in this appeal. Accordingly, we reject Defendant's argument that the district court should have suppressed the evidence that the officers obtained from the scene of Defendant's arrest.

B.

Defendant next argues that the district court should have granted his motion to suppress evidence that the "drug" referenced at some points during trial was heroin. "This court reviews evidentiary rulings for abuse of discretion." *United States v. Ramer*, 883 F.3d 659, 669 (6th Cir. 2018) (citing *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007)). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012) (citing *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011)).

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "This Court has consistently held that '[a] district court has very broad discretion in making this determination.'" *United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017), *cert. denied*, 137 S. Ct. 2231 (2017) (quoting *United States v. Semrau*, 693 F.3d 510, 523 (6th Cir. 2012) and *United States v. Smithers*, 212 F.3d 306, 322 (6th Cir. 2000)). "Even where the reviewing court 'concludes that the district court's ruling was erroneous, the defendant must demonstrate substantial prejudice to be entitled to a reversal.'" *United States v. Collins*, 799 F.3d 554, 570 (6th Cir. 2015). "An error is harmless unless one can say, with fair assurance that the error materially affected the defendant's substantial rights—that the judgment was substantially swayed by the error." *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001).

This Court need not decide whether the district court's Rule 403 ruling was erroneous because we find that any error was harmless. Although Defendant asserts that "allegations of heroin dealing . . . permeate[d]" his trial, (Reply at 11), with the word "heroin" being used "more than seventy times in front of the jury," (Def. Br. 29), Defendant fails to identify a single instance in which a witness or the government used the word "heroin" in front of the jury. As the government points out, it was Defendant himself who "frequently brought up the drug in his defense." (Gov. Br. 26.) The government admits that it used the word "heroin" once during its closing argument, but only to counter Defendant's argument that "[he] is a drug dealer, just a heroin dealer." (Gov. Br. 25 (citing R. 358 at PageID #2232).) Heroin therefore would not have been an issue during trial except for Defendant's strategic decision to make it so, and Defendant's own conduct does not provide a basis for reversal. *See United States v. Hanna*, 661 F.3d 271, 293

(6th Cir. 2011) (holding that an invited error does not warrant reversal); *United States v. Tandon*, 111 F.3d 482, 489 (6th Cir. 1997) (explaining that "an error introduced by the complaining party will cause reversal only in the most exceptional situation" (internal quotation marks and citation omitted)).

Defendant also argues that he was substantially prejudiced when, during *voir dire*, the court asked potential jurors whether their lives had been substantially affected by heroin. Assuming without deciding that this brief mention of the word "heroin" during *voir dire* was in error, the Court is not persuaded that Defendant's judgment of conviction could have been "substantially swayed by" this single event prior to trial. *See Murphy*, 241 F.3d at 453. The court did not elaborate on its question or connect the question with Defendant or any evidence in the case. Defendant cites no cases to suggest that a single, unexplained question during *voir dire* is erroneous, let alone harmful enough to have "substantially swayed" the judgment of conviction. We therefore reject Defendant's challenge under Rule 403.

C.

Defendant next argues that the district court should have instructed the jury that two police officers provided dual testimony—that is, that they testified as both lay and expert witnesses. Defendant failed to preserve this issue by objecting to the jury instructions at trial, and he concedes that his failure to object at trial results in this Court reviewing for plain error. "Under the plain error standard, this Court has discretion to remedy an error, but only upon a showing that the error is 'clear or obvious, affect[s] a defendant's substantial rights, and seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Ramer*, 883 F.3d at 677 (quoting *United States v. Lopez-Medina*, 461 F.3d 724, 746 (6th Cir. 2006)). "In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial." *United States v. Olano*, 507 U.S. 725, 734 (1993).

An officer may provide "dual testimony as a fact and expert witness" as long as "an adequate cautionary jury instruction [is] provided." *Lopez-Medina*, 461 F.3d at 743. An expert witness may offer opinion testimony based on his or her "scientific, technical, or other specialized knowledge." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998) (quoting Fed. R. Evid. 702). Meanwhile, a lay witness may provide testimony only "based on the witness's perception." Fed. R. Evid. 701. The failure to provide a cautionary jury instruction when a law enforcement officer provides both types of testimony to the jury is a "clear or obvious error" for purposes of plain error review. *Lopez-Medina*, 461 F.3d at 745. Where such error arises from police officers testifying "as experts in their own investigations and giv[ing] opinion testimony on the significance of evidence they have collected," it necessarily "threatens the fairness, integrity, and public reputation of judicial proceedings, regardless of whether the defendant is actually innocent." *Id.* at 745. Therefore, in order to obtain a reversal on this issue under plain error review, a defendant must typically show: (1) an officer provided dual testimony as a fact and expert witness; (2) the trial court failed to provide an adequate jury instruction to provide a "clear demarcation between expert and fact witness roles," *id.* at 744; and (3) the error had an effect on substantial rights, which is "typically established through a showing of an actual effect on the outcome of the case," *id.* at 745 (citing *United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (en banc)).

In this case, Defendant argues that two witnesses, Detective McKinney and Sergeant Abrams, provided dual testimony. However, Defendant fails to show that either witness provided expert testimony. Defendant cites one statement from each witness that he argues was an expert opinion, but we find that each such statement consisted of only lay testimony.

*First*, Detective McKinney explained that his goal in interviewing informant Shellie Grubbs was

> to learn more about the entire process. From my training and experience, I knew with these particular crimes, especially with these fraud type crimes, that there are more than one -- there's more than one person involved. This appeared to be the case, and I wanted to learn as much about it as possible and to possibly develop the case into something further.

(R. 355 at PageID #1779.) Defendant argues that the jury could have easily misconstrued this statement as expert testimony because Detective McKinney had previously testified about his "abundance of training . . . as an investigator." (*Id.* at 1774.) But McKinney's statement did not offer an opinion regarding the weight or significance of any evidence at issue in the case; it was merely an explanation for the investigatory hunches that framed his interview of a cooperating witness. As such, it was lay testimony.

*Second*, while describing Defendant's arrest, Sergeant Abrams said:

> When he stepped out of the vehicle, after -- he stepped from the vehicle while I was probably within two arms lengths of him, and I felt that there was a possibility that he was going to at least try to run or at least try to go blow past me. . . . After almost two months short of being a police officer for 25 years, it was just something that struck me that, hey, if I was three feet away from this guy instead of as close as I was, he would have took off running.

(R. 355 at PageID #1691–92.) This statement was not expert testimony because it merely described Abrams' first-hand perception of Defendant, as colored by his own personal experience. The statement was not based on any type of specialized knowledge or training, and it therefore required no corrective instruction from the court. *See* Fed. R. Evid. 701. Defendant's argument about the jury instructions has no merit.

D.

Defendant next argues that the district court erred when it applied a sentencing enhancement pursuant to USSG §3C1.2. This provision provides that "the offense level should be

increased by two levels '[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer.'" *United States v. Woods*, 604 F.3d 286, 292 (6th Cir. 2010) (alteration original) (quoting USSG §3C1.2). The enhancement applies if "the defendant (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer," and if (5) "this conduct occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *Id.* at 292–93 (quoting *United States v. Dial*, 524 F.3d 783, 786–87 (6th Cir. 2008)).

In this case, the sentencing court applied the §3C1.2 enhancement after finding that Defendant fled from police in a high-speed car chase. Defendant does not deny that the enhancement applies if he participated in the chase; instead, he challenges the sentencing court's factual finding that he did, in fact, participate in the chase. We review a sentencing court's factual findings for clear error. *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002). "A finding is clearly erroneous where, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Webb*, 616 F.3d 605, 609 (6th Cir. 2010) (quoting *United States v. Perez*, 871 F.2d 45, 48 (6th Cir. 1989)).

As the sentencing court acknowledged, the evidence in this case presents a close call as to whether Defendant participated in the car chase. The events leading up to the chase began late one night around 4:00 a.m., when an officer confronted two men near a closed business. The men fled in a white vehicle, accelerated to more than one-hundred miles per hour, ran several red lights, and finally crashed into a telephone pole. The evidence supports two possible versions of the chase: one version where Defendant was in the car, and one where he was not. But because both

scenarios are plausible, we cannot conclude that the sentencing court erred when it found that Defendant participated in the chase.

In Defendant's version of the story, he was not in the car during the chase. Indeed, when officers arrived on the scene seconds after the crash, they did not find Defendant in the vehicle. They found only two men, Defendant's nephews William and Dominic. William was sitting behind the wheel with his legs "stuck" under the dashboard. (R. 373 at PageID #2669; *see also* R. 336 at PageID #1280 ("When we found William, he was unconscious in the driver's seat and his legs were clearly trapped underneath the dash of the vehicle.").) Dominic was in the passenger's seat. Both men were unconscious. Defendant's girlfriend testified that when she spoke to Defendant later that morning, he said that he had been at a bar.

Meanwhile, in the government's version of the story, which the sentencing court credited, Defendant drove the car during the chase and fled from the car after the crash, at which point William moved from the back seat to the driver's seat. The time between the crash and when officers reached the car was under a minute, and William told officers that a third, mysterious person named "Daniel" had been driving the car during the chase. (R. 360 at PageID #2317.) William also told a family member that Defendant "left them for dead," (R. 360 at PageID #2324), and that, "[a]fter we crashed, he [Defendant] got up and ran" because Defendant had "warrants," (R. 373 at PageID #2668, 2670). Officers recovered William's blood from the back seat of the car, suggesting that he was indeed in the back seat at the time of the crash. Evidence collected prior to the crash also supports Defendant's presence in the car during the chase. Officers recorded a phone call between William and another family member on the evening of the crash in which William explained that "he" was going to drop "us" off—implying that at least three people would be traveling together. (*Id.* at 2668.) Around 10:00 p.m., six hours before the chase, Defendant

was photographed at a hotel picking up William and Dominic in the white car. Officers also recovered two cell phones that belonged to Defendant from the scene of the crash. And finally, when Defendant spoke with his girlfriend on the morning of the crash, he asked her to pick him up from a location near the crash site and said that he had been in a fight at the bar. The sentencing court noted that "there's been no testimony at all that they went to a bar," and "you're only going to say you're in a bar fight if you've got some injuries." (R. 373 at PageID #2670.)

Therefore, we find substantial evidence to support both versions of the story, and we are not "left with the definite and firm conviction that a mistake has been committed." *See Webb*, 616 F.3d at 609. Because both versions of events are plausible, the sentencing court did not clearly err when it found that Defendant drove the vehicle during the chase.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's convictions and sentence.